**Gerald Eugene STANO, Petitioner–Appellant, Cross–Appellee,**

v.

**Richard L. DUGGER, Secretary, Florida Department of Corrections, Respondent–Appellee, Cross–Appellant.**

No. 88–3375.

United States Court of Appeals, Eleventh Circuit.

Jan. 2, 1991.

Mark E. Olive, Atlanta, Ga., for petitioner-appellant, cross-appellee.

Margene A. Roper, Belle Turner, Asst. Attys. Gen., Daytona Beach, Fla., for respondent-appellee, cross-appellant.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, JOHNSON, HATCHETT, ANDERSON, CLARK, EDMONDSON, COX, BIRCH, and DUBINA *, Circuit Judges.

FAY, Circuit Judge:

Gerald Eugene Stano appealed from the district court's denial of his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Although Stano raised numerous claims on appeal, this court granted relief, subsequently vacated, under the Sixth and Fourteenth Amendments to the United States Constitution. *Stano v. Dugger,* 889 F.2d 962 (11th Cir.1989), *vacated,* 897 F.2d 1067 (11th Cir.1990) (per curiam). After rehearing en banc and thoroughly reviewing the two issues presented of self-representation and ineffective assistance of counsel, the en banc court concludes that Stano's Sixth Amendment claims are without merit on the facts of this case. We refer this case to the original panel for resolution of all other appellate issues.

## I. FACTUAL AND PROCEDURAL BACKGROUND [1]

This case concerns Stano's appeal of his death sentences pursuant to his confessing and pleading guilty to the murders of two young women in Volusia County, Florida. On August 15, 1982, Stano confessed to Sergeant Paul B. Crow of the Daytona Beach Police Department the murder of Susan Lynn Bickrest, who died from suffocation caused by strangulation and drowning.[2] On October 8, 1982, Stano confessed to Sergeant Crow the murder of Mary Kathleen Muldoon, who died from a gunshot head wound and drowning.[3] Stano was indicted by a Volusia County grand

---

* DUBINA, Circuit Judge, became a member of the court after this appeal had been orally argued, but has participated in this decision after listening to a recording of oral argument. *See* 11th Cir.R. 34-4(g).

1. Our discussion of the background in this case will emphasize the procedural history and judicial rulings relevant to the two Sixth Amendment issues of self-representation and ineffective assistance of counsel considered by the en banc court.

2. On August 15, 1982, Stano gave an oral, tape-recorded confession, which was transcribed, to the murder of Susan Bickrest to Sergeant Crow. Stano stated that he followed Bickrest to her apartment, and engaged her in casual conversation in the early morning hours of December 19, 1975. He described her attire as "blue jeans," a "brown leather type jacket" with "some type" of "sandals ... with ... a[n] inclined heel on them." App. 11–521. Stano persuaded Bickrest to accompany him in his car. When Bickrest began to complain during the drive, Stano struck her in the face. His blow sufficiently stunned her so that she remained silent for "a long period of time." *Id.* at 523. When Stano stopped for a rest stop, Bickrest attempted to exit the car. Stano prevented her escape by pushing her back into the car and locking the doors. The drive continued until Stano stopped the car at a "sandy area, a beach area" that "looked like a pond." *Id.* at 521, 523. There, Stano strangled Bickrest until she was either dead or unconscious, carried her to the edge of the water, and left the scene.

On December 20, 1975, two fishermen discovered Bickrest's body floating in Spruce Creek, approximately one-half mile west of Moody Bridge, which is located on a narrow dirt road in a wooded, remote area of Volusia County, Florida. Investigation of the area revealed a wooden platform shoe at the edge of the water near Moody Bridge. The shoe matched the single shoe found on Bickrest's body. The soil along the edge of the creek was sandy, and water markings on the bridge indicated tidal activity.

The state medical examiner determined that the cause of Bickrest's prolonged death was suffocation through a combination of strangulation and drowning. He also concluded that she sustained facial injuries prior to her death.

3. On October 8, 1982, Stano wrote a full confession to the murder of Mary Kathleen Muldoon in the presence of Sergeant Crow. Stano explained that, in November, 1977, he met "a young lady wearing a jacket and pants combination" and invited her to ride in his car on the pretext of going to a beach party. App. 11–558. At the beach, Stano suggested that they engage in sexual intercourse; Muldoon was not interested. They began to argue, and Stano hit Muldoon on the head and "knocked her half out because she didn't say anything after that." *Id.* Stano stopped the car by the side of the road in New Smyrna Beach and told Muldoon to open the door and to get out of the car. Sliding across the front seat, Stano also exited the car from the passenger's side with his .22 automatic. Another argument ensued; Stano struck Muldoon hard on the head and caused her to fall to the ground. He then "shot her in the right side of the head with the 22 Automatic." *Id.* at 559. Stano returned to his car and drove to Daytona

jury for the murders of Bickrest and Muldoon on January 18, 1983.

The Honorable S. James Foxman, circuit judge for Volusia County, arraigned Stano on February 8, 1983. With Stano's agreement, Judge Foxman appointed public defender Howard B. Pearl to represent Stano.[4] Pearl previously had represented Stano for three guilty pleas to first-degree murders before Judge Foxman. On behalf of Stano, Pearl entered a not guilty plea to each of the two indictments. The court accepted these pleas.

Before Judge Foxman on March 11, 1983, Stano changed his pleas to guilty to the Bickrest and Muldoon murder indictments. Preliminary to the plea taking commenced, Pearl informed the court that, although all discovery from the state had not been produced, Stano wanted to plead guilty to the two murders.[5] Lawrence Nixon, the state

Beach, where he lived. In addition to his confession to Muldoon's murder, Stano directed the sheriff's investigators to the exact location where the body was found.

Muldoon's body was located face down in a drainage ditch in an isolated, wooded area of New Smyrna Beach, Florida. Investigation of the area revealed tidal action in the drainage ditch that emptied into Turnbull Bay. Pieces of shell and dirt were embedded around the knees of the pants worn by Muldoon.

Based upon the autopsy performed on Muldoon's body, the cause of death was determined to be the gunshot head wound and drowning. The state medical examiner concluded that Muldoon was shot at very close range while she was in a kneeling position. Although the bullet entered Muldoon's brain, the medical examiner determined that death was not instantaneous. He also noted that Muldoon sustained facial lacerations prior to her death.

4. In pertinent part, the arraignment proceedings were as follows:

THE COURT: State of Florida versus Gerald Eugene Stano, 83–188, Case 83–189. Let the record reflect that Mr. Stano is here in person. I remember him from prior dealings. He is represented by Howard Pearl of our Public Defender's Office.

Howard, apparently, he's charged with two additional murders.

MR. PEARL: Yes, Your Honor. In each of the two cases Mr. Stano has executed affidavits of insolvency and motions to be declared insolvent. I think the Court can take judicial notice that he remains insolvent from his last appearances before this Court.

THE COURT: ... Right now I'm going to appoint the Public Defender to represent you.

Is that what you want me to do, sir?

THE DEFENDANT: Yes.

....

THE COURT: For now I am going to appoint the Public Defender. Agreed?

THE DEFENDANT: Yes.

THE COURT: The Public Defender is appointed.

App. 10–285–86 (transcript of Stano's arraignment before Judge Foxman, Feb. 8, 1983).

5. The following discussion occurred before Stano entered his guilty pleas:

MR. PEARL: May it please the Court, the defendant moves for leave to withdraw his previously entered pleas of not guilty to the single counts of the two indictments and announces he is ready for arraignment and that he intends to enter a plea of guilty as charged to each of the charges of murder in the first degree.

Further, he intends to move the Court that the sentencing jury be waived and that the Court determine sentence in this cause.

Before proceeding, Your Honor, as I have told Mr. Stano I would do, there are a couple of things I would like to inform the Court about in his presence that might appropriately be made a part of the plea dialogue.

At this time, Your Honor, I have not yet received full discovery from the state with respect to these cases and, therefore, am not prepared to say that I know all of the substantive facts concerning these two killings. The delay has been because much of the materials has [sic] not yet been received by the State and Mr. Nixon [state prosecutor] told me he would like to gather everything up at once and submit it to me rather than in installments. I agreed with that.

THE COURT: So, you're not complaining, you're just stating this for the record.

MR. PEARL: No, that is not a complaint. I'm just making my position clear in Mr. Stano's presence about the entry of this plea; that is to say, that I am not fully prepared to advise him as to whether the State has sufficient evidence to convict him or not. He is convinced that they do.

I have spoken with Mr. Nixon. I have confidence, certainly, in his integrity and honesty, and he assures me that the State can independently establish the corpus delecti in both of these cases. And Mr. Stano tells me that that is so.

Further, I have asked him about the admissions or confessions that he has made to Detective Paul Crow. And he assures me that those statements were made voluntarily, they were made competently, and intelligently after warning of his rights and that, therefore, there does not exist a good possibility that either of his admissions could be suppressed on a hearing.

prosecutor, told the court that he had sufficient evidence to prove Stano's commission of the homicides. He explained that the missing discovery to which Pearl referred was similar fact evidence relating the Bickrest and Muldoon murders to other Florida homicides committed by Stano. This evidence was relevant to the sentencing phase and not to the proof of the murder charges at trial.[6]

With Pearl's concerns regarding the lack of full discovery on the record, Stano was

> He feels that he wants to go forward and enter this plea rather than go through a trial or even a delay at this time.
> I have agreed that certainly he has the right to do so, but that he should know, and it should be on the record, that I am not fully prepared at this time as his attorney to advise him with respect to the advisability of a trial or not.
> *He tells me he does not want a trial.*
> THE COURT: Okay.
> *Mr. Stano, do you care to comment on what Mr. Pearl has just said?*
> THE DEFENDANT: *No. I believe everything was quite sufficient that he said.*
> THE COURT: *He stated things accurately?*
> THE DEFENDANT: *Yes.*
> THE COURT: *You're in agreement with what he said?*
> THE DEFENDANT: *Yes, sir.*

App. 10–289–91 (transcript of plea proceedings before Judge Foxman, Mar. 11, 1983) (emphasis added).

6. The state prosecutor related to the court the following information regarding the sufficiency of the state's case and the missing similar fact evidence:

> MR. NIXON: Your Honor, I would also add, for the benefit of the Court this morning, that I'm in fact prepared and have prepared documents that, during the entry of this plea, that both defense counsel as well as the Court will be able to examine, that the facts support very clearly, not only the prima facie case, but evidence arising to proof beyond reasonable doubt as to Mr. Stano's committing each of these homicides.
> So, as far as the factual basis for taking of the plea, I'm prepared to present each of those documents and have the Court examine those so the Court is assured that, in fact, the plea is being entered in good faith and on a solid factual basis.
> The materials Mr. Pearl referred to primarily of [sic] having to organize is [sic] not so much of substantive facts of each of these two cases. As the Court will see, the facts surrounding these [cases] are quite simple in terms of the two homicides. What was involved was the fact that, because of the number of other homicides around the state and because there was the possibility of

placed under oath and the taking of the pleas proceeded. Stano testified that he was thirty-one years old, that he had a twelfth-grade education and computer training, and that he had worked as a cook, computer operator, and desk clerk in a gas station. The court determined that Stano had not had any psychiatric problems and that he had been evaluated competent to stand trial.[7]

> similar-fact evidence being used, that this is where the complexity of the analysis came in; not so much the facts of the particular cases he's about to plead to, but the fact that the case would have been complex simply because of the State intending to present similar-fact evidence of other homicides occurring in different parts of the state of Florida.
> So, I wanted to at least make sure that we understand that the complexity dealt more in my opinion with the sentencing phase of the case more so than the proof of the underlying homicide charges.
> *Id.* at 291–93.

7. The following questions concerning Stano's psychiatric condition and competency to stand trial were asked by the court and answered by Stano during the plea proceedings:

> Q. [THE COURT] Have you ever suffered from any mental or emotional disability or any psychiatric problem?
> A. [THE DEFENDANT] No.
> Q. Okay.
> MR. PEARL: Your honor, may I point out at this time, for the record, that Mr. Stano has been extensively examined by a group of psychiatrists who, some of whom, believe that he does suffer from some impairment. But we are not making a claim that he is either incompetent now or that he was insane as the laws of the State of Florida require at the time of the commission of the crime. But I do not wish to be foreclosed from presenting evidence of impairment at the [sentencing] hearing.
> THE COURT: Fair enough.
> BY THE COURT:
> Q. You understand that?
> A. Yes, sir.
> MR. NIXON: Likewise, Your Honor, at this stage of the plea dialogue, I would ask the Court, if I can, to take judicial notice that you have previously entered orders, more particularly, in Case No. 81–046–CC, in which the issue of Mr. Stano's competency after examination of a number of psychiatric reports from Dr. George W. Barnard, Dr. Frank Carrera, Dr. Fernando Stern, Dr. Robert Davis, and Dr. Ann McMillan, the

Judge Foxman explained to Stano in detail the results of his pleading guilty, particularly the removal of the jury from the proceedings, and he ascertained that Stano had discussed these consequences with Pearl.[8] Judge Foxman further discussed with Stano that pleading guilty waived his defenses and rights to a jury trial with representation by counsel; he elicited from Stano that his pleas were voluntary and emphasized that pleading guilty did not commit the judge to a particular sentence.[9] Judge Foxman specifically determined that Stano was satisfied with the services of Pearl.[10]

> Court had in fact found Mr. Stano was competent, as the defendant, for entry of the plea.
> BY THE COURT:
> Q. That's true, Mr. Stano, you know we have had a number of other cases together.
> A. Right.
> Q. *And we have had extensive psychiatric evaluations. And as best I can tell, you're competent to stand trial under the laws of the State of Florida and probably were not insane at the time of the offense?*
> *Would you agree with that?*
> A. *Yes.*
>
> *Id.* at 294–95 (emphasis added).

8. The following explanation, regarding the consequences of pleading guilty, was given to Stano by Judge Foxman:

> BY THE COURT:
> Q. Mr. Stano, do you understand what you're doing here today?
> A. [THE DEFENDANT] Yes.
> Q. Okay.
> Mr. Stano, I want to talk to you a little bit about it.
> Now, we have a single count in each case of first-degree murder. The only possible sentences in Florida—sentences in Florida—are life with a twenty-five year mandatory minimum, or death. And those are the only two possible sentences.
> Normally, the way these cases proceed is that there's a jury trial. Of course, if there's acquital [sic], it goes no further. If there's a conviction of first-degree murder, the jury, the twelve-man jury that heard the case, meets in a second phase of the trial, what we call bifurcated proceedings. And they listen to evidence in mitigation and aggravation under Florida Statute 921.141. They come back with a recommendation as to life, or death, to the Judge. And the decision is the sole decision of the Judge. But under Florida law, the way it's evolved, the Judge is pretty well bound by the jury recommendation.
> *And so, what you're doing in essence, is you're taking the jury out of the sentencing proceedings and it will proceed in front of me, and I will act as the Judge and jury under Florida Statute 921.141. The attorneys will present evidence in mitigation and aggravation, and I'll make the sole decision.*
> *So, in essence, what you're doing is you're taking the jury out of the proceedings.*
> A. (Nods head.)
> Q. Okay. *Sir, do you understand that?*
> A. *Yes, sir.*

> Q. Okay. *You have been through this with Mr. Pearl; have you not?*
> A. *Yes, sir.*
> Q. Okay. *Do you have any questions of me or Mr. Pearl at this time?*
> A. *None.*
>
> *Id.* at 295–97 (emphasis added).

9. As the plea colloquy proceeded, Judge Foxman discussed with Stano the consequences of his pleading guilty, including sentencing:

> BY THE COURT:
> Q. Mr. Stano, "Guilty" means that you admit the truth of the charges against you.
> A. [THE DEFENDANT] Yes, sir.
> Q. You don't have to plead guilty if you don't want to.
> *By pleading guilty, you're waiving your right to a jury trial as to guilt or innocence; at that trial, to be represented by a counsel; the right to confront witnesses against you; your right to compel the attendance of those who will testify on your behalf.*
> *Once you plead guilty, you waive any defenses you might have. You severely restrict and limit your ability to appeal.*
> Is anybody forcing you to do this or twisting your arm?
> A. No, sir.
> Q. *This is completely voluntary?*
> A. *Yes.*
> Q. *You understand that there's no deal with me on sentence. You get a fair sentence hearing, and that's all I can promise you.*
> A. *Yes, sir.*
> Q. *Do you feel that there's any type of deal or anything else like that?*
> A. *No, sir, not at all.*
>
> *Id.* at 299–300 (emphasis added).

10. Judge Foxman ascertained the voluntariness of the change of plea from Pearl and Stano as well as Stano's satisfaction with Pearl's services as follows:

> THE COURT: The plea is in no way conditional; is it?
> MR. PEARL: No, sir, it is not.
> THE COURT: It is an unconditional plea.
> MR. PEARL: It's an unconditional plea of guilty. All we have is the sentencing hearing to face.
> THE COURT: Fair enough.
> BY THE COURT:
> Q. *The plea is voluntary?*
> A. [THE DEFENDANT] *Yes, sir.*
> Q. *Are you satisfied with the services of Mr. Pearl?*

Following the evidence produced by the state of each homicide, Stano pled guilty to the Bickrest and Muldoon murders. Judge Foxman concluded that Stano's pleas were knowing, intelligent and voluntary, and that Stano had the advice of competent counsel with whom he was satisfied.[11] Judge Foxman accepted Stano's pleas and adjudicated him guilty.

Sentencing proceedings, including an evidentiary hearing, were conducted before Judge Foxman on June 8, 9 and 10, 1983; Stano was represented by Pearl. On June 13, 1983, Judge Foxman sentenced Stano to death in both the Bickrest and Muldoon cases. Judge Foxman commented at sentencing that he had been impressed by the number of Stano's murder convictions, his lack of motive and absence of remorse.[12] He entered written factual findings supporting the death sentence in each case.

On direct appeal from the imposition of the death penalty in the Bickrest and Muldoon cases, the Supreme Court of Florida affirmed the adjudications of guilt and sentences of death by the trial court. *Stano v. State,* 460 So.2d 890 (Fla.1984) (per curiam), *cert. denied,* 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 863 (1985). The Florida Supreme Court noted that "[p]rior to these proceedings, Stano had pleaded guilty to six counts of first-degree murder for the killing of six young women and, pursuant to a plea bargain agreement, had been sentenced to six consecutive terms of life imprisonment without eligibility of parole for twenty-five years."[13] *Id.* at 892. Subsequently, the governor of Florida signed a warrant for Stano's execution.

Pursuant to Florida Rule of Criminal Procedure 3.850, Stano requested post-conviction relief from the state trial court. Judge Foxman held a hearing on December

---

A. *Yes, I am.*
Q. *Do you have any complaints at all about his services to you as your attorney?*
A. *No.*
Q. Okay.
*Do you have any questions of Mr. Pearl, or myself at this time?*
A. *No, I don't.*
*Id.* at 302–03 (emphasis added).

11. Following the presentation of the state's evidence in the Muldoon case, Judge Foxman accepted Stano's plea:
BY THE COURT:
Q. Mr. Stano, to the facts outlined by the State Attorney, the documents that he's just admitted into evidence for the purposes of this plea, do you plead guilty?
A. [THE DEFENDANT] Yes, sir.
Q. All right. Do you have any questions of Mr. Pearl or myself?
A. No, sir.
THE COURT: All right. The Court accepts the plea. The Court finds it's made knowingly, intelligently, and voluntarily, that you have had the advice of counsel, of [a] competent attorney, with whom you say you are satisfied.
*Id.* at 312.
Similarly, following the presentation of the state's evidence in the Bickrest case, Judge Foxman accepted Stano's plea:
BY THE COURT:
Q. Mr. Stano, as to the facts outlined by the State Attorney as to Susan Bickrest, how do you plead?
A. [THE DEFENDANT] Guilty.
Q. All right. Do you have any questions of me or Counsel?
A. No, sir.

THE COURT: Okay.
The plea is accepted.
The Court specifically finds that it is made knowingly, intelligently, and voluntarily, that you have had the advice of competent counsel with whom you say you're satisfied.
*Id.* at 318–19.

12. Prior to sentencing Stano to death in the Bickrest and Muldoon cases, Judge Foxman made the following observations:
THE COURT: All right. I have a couple of observations to make, Mr. Stano. This case is different than the other homicides I've seen because of the sheer number of convictions before Florida circuit courts. This is number seven and number eight.
As best I can tell, there are no connections between these murders; they don't involve connected defendants and we have—this is the eighth conviction in a Florida circuit court of you for first degree murder.
The sheer magnitude of that number is hard to comprehend. I can see no motive for the killings, Mr. Stano. They seem to be completely senseless to me. Normally we see lust, passion, greed, a need to eliminate a witness, but, I don't see that here. These murders are completely senseless.
Finally, I detect no remorse whatsoever, no remorse for the two murders in front of me.
App. 10–329–30 (transcript of sentencing proceedings before Judge Foxman, June 13, 1983).

13. The Florida Supreme Court also noted that Stano previously had *confessed to nine murders,* but was charged with and sentenced for only six homicides. *Stano,* 460 So.2d at 894 n. 2.

1, 1986. Judge Foxman expressed his frustration that Stano, claiming innocence of the Bickrest and Muldoon murders, was attacking his guilty pleas made under oath. Stano's present appellate counsel tenuously proposed that Stano was representing himself by entering a plea against his attorney's advice, and that the trial court should have engaged in the inquiry required by *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).[14] Significantly, the state observed that Pearl did not move to set aside the pleas when he did receive full discovery during the time between Stano's entering the pleas and his sentencing.[15] Judge Foxman granted a continuance of the hearing until January 27, 1987.

Judge Foxman's order, denying Stano post-conviction relief, was issued on April 13, 1987. With respect to the ineffective assistance of counsel claim resulting from

Pearl's not having received all of the state's discovery, Judge Foxman concluded that, because Stano acknowledged the missing evidence and directed his attorney to proceed with the plea on the record, he waived his rights under Florida law to complain about these issues at a later date.[16] In the interest of finality, Judge Foxman concluded that a court would not go behind a guilty plea given under oath after being assured that the plea was voluntary.

Finding the record conclusive, negating the necessity for an evidentiary hearing, the Florida Supreme Court affirmed the trial court's denial of post-conviction relief to Stano on February 25, 1988. *Stano v. State*, 520 So.2d 278 (Fla.1988) (per curiam). The Florida Supreme Court agreed with the trial court that Stano's guilty pleas were freely and voluntarily given without duress after discussions with his attorney, and that Stano had no questions

**14.** The following dialogue, regarding Stano's guilty pleas, occurred at the post-conviction hearing between Judge Foxman and Mark Olive, Stano's new attorney, succeeding Pearl:

> THE COURT: What if he was acting under the advice of his counsel not to [plead]? What if he told his counsel, I'm guilty, I want to plead guilty and get it over with? What is Pearl to do then?
>
> MR. OLIVE: Judge, you know, for purposes of your question—and I don't know—I don't want to concede anything else, but for purposes of your question, that may have been exactly what happened, you know.
>
> ....
>
> THE COURT: ... But what if the defendant directs counsel to enter the guilty plea, to allow it?
>
> MR. OLIVE: ...
>
> So, first of all, if the client says, plea me, plea me, that's all there is to it, and the defense attorney has some problem that, he should tell the Court. And if the defendant is proceeding against the advice of counsel, I think that the Court should, under Foretta (phonetic) say, well, you're representing yourself, Buddy. And if you're representing yourself the Court has to be satisfied that he has waived counsel.
>
> That may be stretching the law some. I don't think it is. I think that is the Foretta [sic] law.

App. 6–1267–69 (transcript of the post-conviction hearing before Judge Foxman, Dec. 1, 1986).

**15.** Lewis Stark, the assistant state attorney, explained that Pearl did not move to set aside Stano's guilty pleas after receipt of full discovery from the state prior to sentencing:

> MR. STARK: ...
>
> There was a period of time from March the 11th, the day the plea was entered, until June the 8th, 9th, and 10th and, finally, June the 13th with[in] which at any time during that period Howard [Pearl], after receiving full discovery from the state, could have moved for a motion to set aside that plea. None was ever done. I think that needs to be considered a little bit by the Court.

*Id.* at 1302.

**16.** Regarding Stano's ineffective assistance of counsel claim relating to his guilty pleas when some of the state's discovery had not been produced, Judge Foxman's order denying post-conviction relief states:

> Trial counsel specifically stated he had not yet received full discovery; did not know the substantive facts concerning the two killings, couldn't advise the Defendant whether there was sufficient evidence to convict him or not; and, was assured by the Defendant that the confessions were valid. The Defendant acknowledged all this on the record. In essence the Defendant waived his rights to later complain about those matters. Further, he isntructed [sic] his attorney to proceed with the plea. Attorney Pearl did as he was told by this client. Since Pearl was acting at the express direction of his client the first criteria of *Knight vs. St.*, 394 So.2d 997, (Fla.1981), cannot be said to have been met. Any "overt act" or "specific omission" was at the direction of Stano himself.

*State v. Stano*, Nos. 83–188–CC, 83–189–CC (Fla. Cir. Ct. Apr. 13, 1987) (order denying Stano Fla. R. Crim. P. 3.850 relief).

to ask his counsel before pleading guilty.[17] *Id.* at 280. The court specifically noted that *Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985), held that the two-part test in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), applies to challenges to guilty pleas, and that Stano's claims did not demonstrate that his counsel's performance fell below an objective standard of reasonableness or that, but for his counsel's unprofessional errors, the result would have been different. *Stano,* 520 So.2d at 280 & n. 2.

When the Florida governor signed another death warrant, Stano petitioned for a writ of habeas corpus and stay of execution. In denying the requested relief on May 16, 1988, the Florida Supreme Court concluded that Stano's claims of alleged constitutional violations essentially were complaints regarding the voluntariness of his guilty pleas and his counsel's effectiveness concerning the pleas.[18] *Stano v. Dugger,* 524 So.2d 1018 (Fla.1988) (per curiam). Having addressed these complaints in Stano's direct appeal and in his petition for post-conviction relief, the court declined to revisit those issues, and found them to be raised improperly. *Id.* at 1019. The Florida Supreme Court specifically found that

Stano's allegations of ineffective assistance of counsel were meritless because he had not established prejudice, the second part of the *Strickland* test for ineffectiveness. *Id.*

Following Stano's petition for habeas corpus relief to the United States District Court for the Middle District of Florida, the Honorable Patricia C. Fawsett conducted an evidentiary hearing on May 17, 1988. The testimony of Howard Pearl, Stano's court-appointed attorney, is significant to the Sixth Amendment issues in this case. In addition to his prior representation of Stano before his change of pleas in 1983, Pearl had represented approximately 300 death penalty inmates, approximately 75 of whom were defendants in capital trials.[19] When Stano told Pearl that he wanted to change his pleas, Pearl advised Stano that he had not had an opportunity to investigate the cases completely because he had not received all of the state's evidence. Pearl also explained to Stano that he had not had the opportunity to negotiate with the state, that Stano's pleas were premature, and that death penalties was likely.[20] Nevertheless, Stano insisted on pleading guilty immediately.

---

**17.** The Florida Supreme Court recognized that Judge Foxman had accepted three previous guilty pleas to first-degree murders from Stano. *Stano,* 520 So.2d at 279.

**18.** The Florida Supreme Court characterized Stano's complaints regarding the circumstances under which he pled guilty as follows:

Stano first claims that the circumstances surrounding his guilty pleas violated his constitutional rights and that the trial court did not provide a record that conclusively shows that Stano knowingly, intelligently, and voluntarily waived his right to trial. In reality these issues boil down to a complaint about the voluntariness of Stano's guilty pleas and trial counsel's effectiveness regarding these pleas.

*Stano v. Dugger,* 524 So.2d 1018, 1018–19 (Fla. 1988) (Per Curiam).

**19.** From 1972 through 1977, Pearl represented 300 felony, noncapital defendants per year. Since 1977, he handled only death penalty cases. From 1977 through 1983, with at least 25 capital cases a year, Pearl represented approximately 300 death penalty defendants and had approximately 75 capital trials. R3–123–24, 223 (transcript of the evidentiary hearing on Stano's fed-

eral habeas corpus petition before Judge Fawsett, May 17, 1988).

**20.** Judge Fawsett specifically questioned Pearl as to whether Stano's pleading guilty was against his advice:

THE COURT: Mr. Pearl, are you testifying that Mr. Stano directed you to enter or to go through with a proceeding in which he entered a plea of guilty in the Bickrest and Muldoon cases against your advice?

THE WITNESS [Pearl]: Yes, ma'am.

THE COURT: When did you give him that advice?

THE WITNESS: Very shortly before we entered the plea. I had—shall I continue?

THE COURT: Yes.

THE WITNESS: I had received some discovery from the state, and went to talk to Mr. Stano about it. As a matter of fact I think if I am not mistaken he sent for me because he wanted to talk to me and I wanted to talk to him and he announced to me that he wanted to enter a plea of guilty to the first degree murder charges and do so without delay to both of them. Wanted to waive a sentence jury and allow Judge Foxman alone to determine what his sentence would be. I advised

Pearl testified that he had a two-part strategy for defending Stano at the sentencing proceedings in an attempt to avoid the death penalty. First, he wanted to obtain testimony from mental health professionals that Stano was acting under a mental disability when he committed the Bickrest and Muldoon murders. Second, he sought the opportunity to persuade Judge Foxman that there should be proportionality, or the same sentences for Stano, since Judge Foxman had sentenced Stano to three life terms for three guilty pleas to similar first-degree murders in Volusia County.[21] Judge Fawsett questioned Pearl

in detail about the sentencing information and advice that he gave to Stano prior to his entering guilty pleas to the Bickrest and Muldoon murders.[22]

Furthermore, Pearl explained to Stano that he was at risk for the death penalty before he pled because the six prior murders to which Stano had pled guilty constituted statutory aggravating circumstances; the Bickrest and Muldoon cases could be aggravators for each other; and Florida law presumes death to be the proper penalty for one aggravating circumstance. Pearl also informed Stano of his belief that the death penalty probably would be imposed because Judge Foxman had taken

him against it. I told him it would be premature, I had no opportunity to make a full investigation, or take depositions, or to verify any of the allegations of the two indictments, and that I could not predict for him what would happen if he were to enter a plea at that time.

That a death sentence was a possibility, if not a likelihood.

I told him that I just didn't know enough about those two cases at that time to be able to advise him with respect to whether he should ask for, whether he should demand a trial or enter a plea. And more over, I had no opportunity whatever except a very brief one to try to negotiate with the state on disposition of these cases ... the only approach I had made to Mr. Nixon, as assistant state attorney concerning—that was met with a refusal and he intended to go forward and seek the death penalty.

*Nevertheless, in spite of my advice and against my advice, Mr. Stano insisted that he wanted to immediately enter a plea of guilty and to waive the sentencing jury and that was what was done.* There is a plea dialogue in which I think I made clear what my position was when he entered his plea before Judge Foxman on a later date. To wit, March 11, 1983.

*Id.* at 196–97 (emphasis added).

**21.** Stano had received a total of six life sentences for six murder convictions at the time of his pleas in this case. *Id.* at 201.

**22.** Judge Fawsett questioned Pearl as follows concerning the advice that he gave Stano regarding Pearl's strategy for the sentencing proceedings prior to Stano's pleas:

THE COURT: Did you discuss the strategy with Mr. Stano on more than one occasion?
THE WITNESS [PEARL]: Your honor, I am unable to answer that. I think so. But I am not absolutely sure.
THE COURT: Did Mr. Stano register any objection or concurrence or any reaction?

THE WITNESS: He said that he understood. His reaction seemed to be that he felt more confidence than I did that Judge Foxman would in fact sentence him to two more life terms. He just—I think he was confident that Judge Foxman would do that. More confident then [sic] I was.
THE COURT: *Did you discuss with Mr. Stano your view of the likelihood of Judge Foxman sentencing him to a life in prison term as opposed to execution.*
THE WITNESS: *Yes. I told him it was certainly possible, but at the same time he faced the very strong possibility of two death penalties instead, and that the state attorney had been saying to me that he would vigorously seek the death penalty because of the fact that these two additional murders had come out after the original arrangement had been closed down* and as Mr. Nixon put it to me, there's is no deal any more, and I have to seek the death penalty, or the public will become enraged. They will think that we have—we in the state attorneys[' office] have no regard for human life.
*I explained that to Mr. Stano. I told him he was at risk.*
THE COURT: *When did you explain this to him?*
THE WITNESS: *First before March 11th. I explained to him that he was at risk for the death penalty.*
THE COURT: *Before entry of the plea of guilty?*
THE WITNESS: *Yes, ma'am. There aren't any deals, I had spoken to Mr. Nixon and Mr. Nixon said the deal was not any longer in operation and he was going the [sic] seek the death penalty, and Mr. Stano understood that. But nevertheless persisted and insisted on entering a plea.*
And—but I can't tell you with what frequency I discussed with Mr. Stano the strategy or approach to the sentencing hearing after the entry of the plea, once I know. How many more times then [sic] that I am unable to say.
*Id.* at 202–03 (emphasis added).

three prior guilty pleas from Stano for murders in Volusia County in which Stano had benefitted from an agreement for life sentences with the state attorney. The agreement was not applicable to the Bickrest and Muldoon pleas, and Pearl, based on his experience, told Stano that guilty pleas to these additional murders made it "absolutely a dead probability beyond dispute he would get the death penalty." R3–

**23.** Judge Fawsett and Mark Olive, Stano's attorney for his federal habeas corpus appeal, questioned Pearl as follows regarding his advice to Stano concerning the probability of his receiving the death penalty from Judge Foxman for pleading guilty to the Bickrest and Muldoon murders:

> Q. [THE COURT] Did you give any reason to him [Stano] or reasons to him for your opinion that death would be more probable then [sic] life?
> A. [THE WITNESS (Pearl)] Yes, your Honor, but in these terms. I did not discuss with him the aggravating and mitigating statutory circumstance set forth in the sentence statute.
> I did say to him, in substance, that because there had been three prior convictions in Volusia County, of which Judge Foxman was aware and had in fact been involved, that he might very well take the position already taken by the state that two more could no longer be excused or passed off or otherwise treated lightly, as by life sentence, and that Judge Foxman might be convinced that he ought to give Mr. Stano a death sentence simply because of what you would call the reoccurrence, Mr. Stano coming back into court, after having been before Judge Foxman before and having received the benefit of an agreement.
> Q. What was Mr. Stano's response, if any, to that advice?
> A. He did not—his reaction was that he did not seem to think that Judge Foxman would sentence him to death and I think he expressed confidence that Judge Foxman would not, and I told him that Judge Foxman might very well do it in spite of that.
> ....
> BY MR. OLIVE (redirect examination):
> Q. You felt pretty darn certain a death sentence would come out of this, didn't you, sir? Any rational human being would think a death sentence would come out of this.
> A. I handled enough of them by then, and this one had the ear marks, Mr. Olive.
> Q. Very clear ear marks?
> A. I couldn't be positive, you know, there wasn't any way to be positive and I did express it to Mr. Stano in terms that it would absolutely, it was absolutely a dead probability beyond dispute he would get the death penalty. I did tell him that I thought it was

237. Stano, however, was confident that Judge Foxman would give him additional life sentences.[23] Although Pearl informed Stano of the rights that he would relinquish by pleading guilty, Stano, who never denied to Pearl that he committed the Bickrest and Muldoon murders and believed that the state could prove that he committed the two homicides, elected to proceed with pleading guilty.[24]

> likely, and the only thing I could tell you now that back then all I felt was that it was likely.
> Q. He was, well, he was greatly at risk, wouldn't you say?
> A. Certainly, sir.
> Q. For the death penalty?
> A. Yes.
> Q. Greatly at risk?
> A. Yes, sir.
> Q. And yet you're telling us that in your conversations with him he was confident? Those are words you have used two or three times that he would get life?
> A. Optimistic, confident, feeling that he transmitted to me was that he felt that Judge Foxman wouldn't do that to him. Of course I guess he felt that Paul Crow wouldn't either, but that was, I mean these are feelings that he had, emotions that he had, and I am trying to express them but of course I don't know precisely what was in his mind.
> Q. We have a PSI that talks about thirty[-]eight confessions, six convictions and you have got a judge who told him the last time he was there that he thought it was worth the death penalty, correct?
> A. Yes.
> Q. In light of all those circumstances it was your opinion at that time, not that it was likely, but that it was extremely probable that the death penalty would result in the case?
> ....
> THE WITNESS: On a scale of ten, eight point two.
> BY MR. OLIVE:
> Q. Ten is you are going to get the death penalty?
> A. Beyond doubt.
> *Id.* at 236–39.

**24.** Regarding Pearl's counsel concerning the rights that Stano would waive by pleading guilty, state attorney Belle Turner questioned Pearl as follows at the evidentiary hearing before Judge Fawsett:

> Q. [MS. TURNER (cross examination)] Now you had discussions with your client before the pleas were entered in this case....
> A. [THE WITNESS (PEARL)] Well, in our interview I certainly asked him ... whether he had been advised of his rights, under Miranda [the] right to remain silent, right to demand counsel be present and so forth. He

After Stano pled guilty and before he was sentenced, the state abandoned the legal theory of similar fact evidence that was supported by the unproduced discovery at the time of Stano's pleas. Therefore, Pearl had received from the state and reviewed all evidence regarding the Bickrest and Muldoon murders before the plea proceedings.[25] Prior to Stano's sentencing, Pearl continued his investigation, including his pursuit of an insanity defense.

Preceding his sentencing, Stano was examined by five mental health experts, four of whom testified at his sentencing proceedings. In response to Judge Fawsett's questions regarding Stano's competency, Pearl explained that he did not question Stano's ability to understand the issues involved in the case, but that he diligently, although unsuccessfully, pursued an insanity defense for Stano as the only explanation for his murders.[26] Pearl's complete

understood those rights when he made confessions and confessions were made voluntarily.
Q. Did he ever give you any indication that he was not guilty of these crimes?
A. He never denied to me that he had in fact committed the crimes. On the other hand it is not my practice in dealing with a client to ask that sort of question directly.
Q. But he gave you no indication of that otherwise; is that correct?
A. No. He did not.
. . . .
Q. *Now when you were discussing the, before the plea was entered, did you discuss with your client's [sic] the rights that he would be giving up?*
A. Yes.
Q. *And what did you tell him?*
A. *Well, . . . pretty much the same as a trial judge would go through a dialogue upon the taking of a plea.*
*I [Stano] was giving up certain rights such as the right to remain silent, the right to confront the witnesses against him, the right to a trial by jury, and so forth, that, you know, that bunch of rights which anyone gives up on the entry of a plea of guilty, plus of course giving up the right really to appeal any error which might have taken place in the proceedings up to the time of judgment.*
Q. That's because the pleas ratified prior confessions, is that true?
A. Yes, ratifies all of that. You can no longer attack evidences [sic] as being not reliable or not genuine.
Q. Plea is in fact an in-court confession, would you agree with that statement?
A. Has been said, probably that is true.
Q. Did you advise him of the state's burden of proof that if he did choose to go to a trial that the state would have to prove the case against him?
A. Didn't think I put it to him directly that way. *I think in the course of our discussions I asked him whether he thought the state . . . could prove that he had committed these two killings and he told me that he felt that he was sure that they could.*
*Id.* at 226–29 (emphasis added).

25. Judge Fawsett specifically questioned Pearl regarding the discovery which had not been produced to him at the time of Stano's pleas:

THE COURT: Did you have discovery materials when you had the conference with Mr. Stano prior to the March 11, 1983 proceeding?
THE WITNESS [PEARL]: I had possession of them. I had not brought them with me.
THE COURT: Had you reviewed them?
THE WITNESS: I had. Such as had been furnished. Now discovery was not complete. There were additional materials that [the] state attorney was gathering up, and we had entered into an agreement that he would gather them all up and furnish them to me in one body, rather then [sic] trickling them out one page or two at a time.
THE COURT: *Did you have these discovery documents prior to the sentencing proceeding?*
THE WITNESS: *Well, the additional discovery materials to which I alluded had to do with the proposed state plan to introduce similar fact evidence. . . .*
*After the entry of the plea, the state apparently lost interest in gathering further materials or in presenting that proof.* Since it would not have been an aggravation [sic] or mitigation of the statute nine twenty one point— nine twenty one point one four one.
*So apparently the state abandoned that plan to present the similar fact evidence. So I had essentially everything else, everything as far as I knew, that had to do with the offense and . . . involving the Muldoon [and] Bickrest killings.*
*Id.* at 199–200 (emphasis added).

26. Judge Fawsett questioned Pearl regarding Stano's competency to enter a plea or to participate in the proceedings as follows:

BY THE COURT:
Q. Before you sit down, Mr. Pearl, *in the course of your representing Mr. Stano in the Bickrest and Muldoon cases, was there anything that made you question whether he was either competent to enter a plea or participate in the proceedings, that actually occurred in the Muldoon and Bickrest cases or question his competency at the time [the] crimes were committed in those two cases?*
A. [THE WITNESS (PEARL) ] *No, your Honor, not competency. I didn't question his competency, his ability to understand, to appreciate and deal with me and to deal with the*

investigation of the Bickrest and Muldoon homicides revealed no basis to attack Stano's confessions or to withdraw his pleas.[27]

Following closing remarks by the parties on May 18, 1988, Judge Fawsett entered factual findings on the record.[28] The district court found that Stano's highly experienced counsel advised him not to plead guilty because of Stano's three previous guilty pleas to first-degree murders before Judge Foxman, the probable death sen-

*issues involved.* I am only a layman, but I thought that a person who would have done the sorts of things that Mr. Stano had done, had, in my opinion, had to have something wrong with his personality or his ability to understand and deal with reality.

*I couldn't detect insanity, but at the same time I felt that the acts are so anti social that insanity must be lurking there. I was trying as hard as I could to find something that even if it was not a Mc Naughton [sic] defense of not guilty by reason of insanity, that I felt that the mental health professionals should have found that he was operating under extreme mental or emotional disturbance.*

Q. Did you pursue mental health evaluations with that goal in mind?

A. *Yes, and strong persistent cross examination of the mental health professionals during the hearing, trying to coax them or persuade them to expand their diagnosis in such a way as to include extreme mental or emotional disturbance.*

*But I was unsuccessful in doing so. They would not go that far.*

*Id.* at 243–44 (emphasis added).

27. Pearl responded as follows to state attorney Turner's questioning regarding his investigation of the Bickrest and Muldoon murders concerning a basis to attack Stano's confessions or to request withdrawal of his guilty pleas:

Q. [MS. TURNER (cross examination)] I am talking about during your representation of Mr. Stano and these two cases. Nothing in your investigation revealed to you, I am not talking about collateral attacks, I am talking about your representation and these two cases, *nothing in your investigation revealed any basis to move to attack his confessions or to withdraw his pleas; is that correct?*

A. [THE WITNESS (PEARL)] *That's correct. Nothing was brought to my attention.*

*Id.* at 231 (emphasis added).

28. Judge Fawsett entered the following factual findings pursuant to the evidentiary hearing:

THE COURT: The court finds that Mr. Stano was represented by a highly experienced attorney who advised him not to enter a plea of guilty to the charges of murder against him in

tences, and Pearl's intent to investigate the murders further. Stano rejected this advice and pled guilty, waiving a sentencing jury. Judge Fawsett concluded that Stano's claims of ineffective assistance of counsel were not valid after he chose to plead guilty following proper plea proceedings, resulting in the imposition of death sentences.

On May 18, 1988, Judge Fawsett also entered a written order denying Stano's petition for a writ of habeas corpus, his

the Susan Bickrest and Mary Kathleen Muldoon cases; who advised that he wished to further investigate the case on behalf of Mr. Stano; and who further advised Mr. Stano that the probable outcome of a plea of guilty would be a sentence of death in view of Mr. Stano's three prior convictions for murder entered before the same judge in Volusia County.

Mr. Stano rejected this advice, directed his counsel to proceed with the entry of guilty pleas and waiver of sentencing by jury.

Counsel followed the instructions of his client, but nevertheless continued his investigation of the case and sought to establish, among other things, the mental status of Mr. Stano as impaired, if not under a Mc Naughton [sic] type test, then at least in a manner sufficient to meet the statutory mitigating factor that the murders of Miss Muldoon and Miss Bickrest were committed while defendant was under the influence of extreme emotional disturbance.

Mr. Stano was examined by five mental health experts who either testified or were presented to the court by way of report. Neither the Mc Naughton [sic] test or statutory aggravating factor were found by the trial court.

Further Mr. Stano's attorney did not have any notice of alleged invalidity of prior conviction for murder which had been reduced to judgment against Mr. Stano.

In fact, Mr. Stano reaffirmed his guilt in the Muldoon and Bickrest murders as well as others on more than one occasion subsequent to the entry of his pleas of guilty in those two cases.

Mr. Stano now contends that his attorney was ineffective for failing to investigate and have suppressed or set aside these convictions or confessions. *Mr. Stano chose a course of action which after valid legal proceedings in the Bickrest and Muldoon cases were held, resulted in the imposition of a sentence of death upon him for his crimes.*

*This court finds no error in those proceedings sufficient for a stay of execution to be entered.*

R4–40–41 (emphasis added).

motion for a stay of execution, and a certificate of probable cause.[29] With respect to Stano's claim that he effectively was acting pro se when he entered his guilty pleas to the murders of Bickrest and Muldoon because Pearl did so little to defend him, the district court recognized that the two-part *Strickland* test applies to guilty pleas in determining ineffective assistance of counsel. The district court recited the preliminary plea colloquy wherein Pearl disclosed to the court that full discovery had not been received and explained that Stano wanted to proceed with the pleas. Stano had agreed with Pearl's representations.

Furthermore, Judge Fawsett noted that Stano stated that he was satisfied with his counsel's performance, that he had no questions to ask Pearl before pleading guilty, and that the trial judge had explained in detail the rights that Stano would waive by pleading guilty. The district court determined that Stano could not establish the prejudice aspect under *Hill* and *Strickland*. Even if Pearl had been able to obtain complete discovery, Judge Fawsett concluded that Stano did not show that, but for errors in Pearl's representation, he would not have pled guilty and would have insisted on going to trial.

Additionally, the district court found that Stano himself limited the effectiveness of his counsel by entering the guilty pleas against Pearl's advice:

> It is clear from the record in this case that Mr. Stano, against advice from counsel, insisted upon entering pleas of guilty. Stano demanded that counsel permit him to plead guilty and waive a sentencing jury and persisted on going forward with this desire as soon as possible. The record shows, therefore, that Mr. Stano, himself, limited counsel's effectiveness by insisting upon a course of conduct that was contrary to counsel's warning that he was not prepared to advise Mr. Stano concerning his cases and contrary to counsel's warning that Stano could receive the death penalty.

*Stano v. Dugger*, No. 88–425–Civ–Orl–19 at 26–27 (M.D.Fla. May 18, 1988) (order denying Stano's petition for a writ of habeas corpus, stay of execution, and certificate of probable cause).

On May 18, 1988, this court granted a certificate of probable cause and stay of execution. *Stano v. Dugger*, 846 F.2d 1286 (11th Cir.1988) (per curiam). The court heard oral argument on February 27, 1989. A majority panel reversed the district court and directed it to grant Stano's petition for habeas corpus based on alternative Sixth Amendment theories: self-representation under *Faretta* and ineffective assistance of counsel under *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), with respect to the repetitively reviewed preliminary plea colloquy. *Stano v. Dugger*, 889 F.2d 962 (11th Cir.1989) (Fay, J., dissenting).

A member of this court in active service requested a poll on the application for rehearing en banc. After a majority of the judges of the court in active service voted in favor of granting a rehearing en banc, the previous panel's decision was vacated. *Stano v. Dugger*, 897 F.2d 1067 (11th Cir. 1990) (per curiam). On June 12, 1990, oral argument was heard by the en banc court solely on the Sixth Amendment claims of self-representation and ineffective assistance of counsel. We now explain these issues as decided by the en banc court.

## II. ANALYSIS

A. The Requirements for Accepting a Guilty Plea Contrasted with the prerequisites for Allowing a Defendant to Proceed Pro Se at Trial

Our analysis of Stano's Sixth Amendment self-representation claim requires us to examine constitutionally and to compare substantively the different inquiries that must be conducted by the trial court when a defendant elects to plead guilty or chooses to proceed pro se at trial. With life or liberty at stake, the accused's Sixth Amendment right to counsel must be pro-

---

**29.** *Stano v. Dugger*, No. 88–425–Civ–Orl–19 (M.D.Fla. May 18, 1988) (order denying Stano's petition for a writ of habeas corpus, stay of execution, and certificate of probable cause).

tected by the trial court. *See Johnson v. Zerbst,* 304 U.S. 458, 465, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The Supreme Court has determined that the Sixth Amendment guarantees the accused "that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *United States v. Wade,* 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967) (footnote omitted); *see Massiah v. United States,* 377 U.S. 201, 204–05, 84 S.Ct. 1199, 1202, 12 L.Ed.2d 246 (1964) (The Court has stressed that a defendant's right to counsel is just as important at the pretrial stage as at trial.). The Court has safeguarded a state criminal defendant's Sixth Amendment right to counsel during critical stages of pretrial proceedings. *See, e.g., Wade,* 388 U.S. 218, 87 S.Ct. 1926 (post-indictment lineup); *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (pre-trial custodial interrogation); *Hamilton v. Alabama,* 368 U.S. 52, 82 S.Ct. 157, 7 L.Ed.2d 114 (1961) (arraignment); *see also Brewer v. Williams,* 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424 (1977) (The Court has instructed that courts must indulge every reasonable presumption against waiver of the right to counsel; "[t]his strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings.").

Specifically addressing guilty pleas, the Court has stated:

> Beyond the problem of trials and appeals is that of the guilty plea, a problem which looms large in misdemeanor as well as in felony cases. Counsel is needed so that the accused may know precisely what he is doing, so that he is fully aware of the prospect of going to jail or prison, and so that he is treated fairly by the prosecution.

*Argersinger v. Hamlin,* 407 U.S. 25, 34, 92 S.Ct. 2006, 2011, 32 L.Ed.2d 530 (1972). Since the criminal defendant forgoes trial and his right to defend himself by pleading guilty, his right to counsel is especially important so that he will understand the basic rights that he waives by choosing to plead guilty. *See Gaddy v. Linahan,* 780 F.2d 935, 943 (11th Cir.1986) ("[A] plea of guilty represents, in essence, an admission as to each and every element of the offense." (citing *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969)). By pleading guilty, a defendant waives several constitutional rights, including the Fifth Amendment privilege against compulsory self-incrimination and the Sixth Amendment rights to a jury trial and to confrontation of one's accusers. *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir.1984) (per curiam) (citing *Boykin v. Alabama,* 395 U.S. 238, 243, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274 (1969)).

Nevertheless, it is not the attorney, but the defendant who enters a guilty plea and who is questioned by the court to determine whether the plea is made voluntarily, knowingly and intelligently. *See Haring v. Prosise,* 462 U.S. 306, 319, 103 S.Ct. 2368, 2376, 76 L.Ed.2d 595 (1983) (Since "a guilty plea is not simply 'an admission of past conduct,' but a waiver of constitutional trial rights such as the right to call witnesses, to confront and cross-examine one's accusers, and to trial by jury," the plea " 'not only must be voluntary but must be [a] knowing, intelligent ac[t] done with sufficient awareness of the relevant circumstances and likely consequences.' " (quoting *Brady v. United States,* 397 U.S. 742, 747–48, 90 S.Ct. 1463, 1468, 25 L.Ed.2d 747 (1970)); *United States v. French,* 719 F.2d 387, 390 (11th Cir.1983) (per curiam), *cert. denied,* 466 U.S. 960, 104 S.Ct. 2174, 80 L.Ed.2d 557 (1984). Although counsel is physically present with the defendant during plea proceedings, the actual plea is between the court and the defendant.

■ A factual basis is necessary for accepting of a guilty plea by a trial court when a defendant proclaims his innocence and yet pleads guilty. *North Carolina v. Alford,* 400 U.S. 25, 38 & n. 10, 91 S.Ct. 160, 167–68 & n. 10, 27 L.Ed.2d 162 (1970); *Wallace v. Turner,* 695 F.2d 545, 548 (11th Cir.1983). In *Alford,* the Supreme Court upheld a guilty plea from the accused who

claimed to be innocent of the first-degree murder charge, when he intelligently believed that he would receive imprisonment if he pled and the death penalty if he underwent a trial because of the abundant damaging evidence against him:

> Thus, while most pleas of guilty consist of both a waiver of trial and an express admission of guilt, the latter element is not a constitutional requisite to the imposition of criminal penalty. An individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime.
>
> Nor can we perceive any material difference between a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of actual guilt. Here the State had a strong case of first-degree murder against Alford. Whether he realized or disbelieved his guilt, he insisted on his plea because in his view he had absolutely nothing to gain by a trial and much to gain by pleading. Because of the overwhelming evidence against him, a trial was precisely what neither Alford nor his attorney desired. Confronted with the choice between a trial for first-degree murder, on the one hand, and a plea of guilty to second-degree murder, on the other, Alford quite reasonably chose the latter and thereby limited the maximum penalty to a 30–year term. When his plea is viewed in light of the evidence against him, which substantially negated his claim of innocence and which further provided a means by which the judge could test whether the plea was being intelligently entered, its validity cannot be seriously questioned. In view of the strong factual basis for the plea demonstrated by the State and Alford's clearly expressed desire to enter it despite his professed belief in his innocence, we hold that the trial judge did not commit constitutional error in accepting it.

400 U.S. at 37–38, 91 S.Ct. at 167–68 (citation and footnotes omitted).

■■■ The plea colloquy, provided in Rule 11 of the Federal Rules of Criminal Procedure, constitutes the constitutional minimum requirements for a knowing and voluntary plea for federal courts, but that rule is not binding on state courts. *Gaddy*, 780 F.2d at 943 n. 8; *Frank v. Blackburn*, 646 F.2d 873, 882 (5th Cir.1980) (en banc), *modified on other grounds*, 646 F.2d 902 (5th Cir.) (per curiam), *cert. denied*, 454 U.S. 840, 102 S.Ct. 148, 70 L.Ed.2d 123 (1981); *see also Owens v. Wainwright*, 698 F.2d 1111, 1113 (11th Cir.) (per curiam) ("Although federal law requires the judge personally to tell the defendant of the mandatory minimum sentence, Fed.R.Crim.P. 11(c)(1), Florida law does not."), *cert. denied*, 464 U.S. 834, 104 S.Ct. 117, 78 L.Ed.2d 116 (1983). A reviewing federal court may set aside a state court guilty plea only for failure to satisfy due process: "If a defendant understands the charges against him, understands the consequences of a guilty plea, and voluntarily chooses to plead guilty, without being coerced to do so, the guilty plea ... will be upheld on federal review." *Frank*, 646 F.2d at 882; *see Boykin*, 395 U.S. at 243–44, 89 S.Ct. at 1712 (Ignorance of the consequences of a guilty plea may require its rejection.).

■■■ Because a guilty plea is equivalent to a conviction,[30] the trial court's determination of voluntariness must consider that "[i]gnorance, incomprehension, coercion, terror, inducements, subtle or blatant threats might be a perfect cover-up of unconstitutionality." *Boykin*, 395 U.S. at 242–43, 89 S.Ct. at 1712. In *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976), after pleading guilty to second-degree murder, a defendant of un-

---

30. The Supreme Court has clarified the consequences of a guilty plea by a defendant: "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." *Boykin*, 395 U.S. at 242, 89 S.Ct. at 1711–12.

usually low mental capacity testified at a habeas corpus evidentiary hearing in federal district court that he would not have pled guilty if his attorneys had informed him that intent was an element of the offense. The Court determined that "clearly the plea could not be voluntary in the sense that it constituted an intelligent admission that he [the defendant] committed the offense unless the defendant received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.' " 426 U.S. at 645, 96 S.Ct. at 2257–58 (quoting *Smith v. O'Grady,* 312 U.S. 329, 334, 61 S.Ct. 572, 574, 85 L.Ed. 859 (1941)). Unavoidable influence or pressure from sources such as codefendants, friends or family does not make a plea involuntary; "[i]t is only where the plea is coerced by conduct fairly attributable to the state that the due process clause of the Fourteenth Amendment is offended." *LoConte v. Dugger,* 847 F.2d 745, 753 (11th Cir.), *cert. denied,* 488 U.S. 958, 109 S.Ct. 397, 102 L.Ed.2d 386 (1988).

The inquiry into whether the plea is made intelligently does not mean that the court must determine whether the defendant is making a "smart" decision by pleading guilty. Instead, "[i]n order for a guilty plea to be entered knowingly and intelligently, the defendant must have not only the mental competence to understand and appreciate the nature and consequences of his plea but he also must be reasonably informed of the nature of the charges against him, the factual basis underlying those charges, and the legal options and alternatives that are available." *Id.* at 751. The defendant does not necessarily need to be told the nature of the offense and elements of the crime at the actual plea proceedings; a knowing and intelligent guilty plea may be entered on the basis of the receipt of this information, generally from defense counsel, before the plea proceedings. *Id.; Gaddy,* 780 F.2d at 944; *see Moore v. Balkcom,* 716 F.2d 1511, 1525 (11th Cir.1983), *cert. denied,* 465 U.S. 1084, 104 S.Ct. 1456, 79 L.Ed.2d 773 (1984).

■ The record of the plea proceedings in this case reveals that Judge Foxman conducted a full and searching inquiry of Stano in complete compliance with Florida law, by the Florida courts, and with constitutional due process. The voluntariness of Stano's pleas is beyond question. Not only was he fully apprised of the charges against him by Pearl and the trial court, but also he had confessed to the Bickrest and Muldoon murders. Furthermore, Stano, not the state, initiated the immediate entry of his pleas. The record also satisfies the voluntariness requirements of *Boykin* because the detailed plea proceeding in this case refutes any claim that Stano swore falsely when entering his guilty pleas. *See Miller v. Turner,* 658 F.2d 348, 351 (5th Cir. Unit B Oct. 1981).

With respect to Stano's knowing and intelligent entry of his guilty pleas, we note that he was thirty-one years old, that he had completed the twelfth grade and computer training, and that he was gainfully employed. Stano's competency to enter his guilty pleas has not been an issue in this case. Pearl pursued an insanity defense through five experts, but he was unsuccessful in convincing them to expand their diagnoses to include extreme mental or emotional disturbance. When Judge Fawsett inquired at the district court evidentiary hearing into Stano's competence to plead or to participate in the proceedings in the Bickrest and Muldoon cases, Pearl responded that he did not question Stano's competency or his ability to work with Pearl and to understand the issues involved in these cases.

■ Furthermore, Stano was not a stranger to plea proceedings before Judge Foxman. Represented by Pearl, he had pled guilty to three previous first-degree murder indictments and received life sentences from Judge Foxman. Pearl had counseled Stano in detail regarding the Bickrest and Muldoon indictments, the evidence produced by the state, the consequences of guilty pleas, the likelihood of death sentences, and his strategy for defending Stano. With full knowledge of the charges against him and the rights that he

was waiving, Stano pled guilty to the Bickrest and Muldoon murders because he believed, against his counsel's advice, that Judge Foxman again would give him life sentences. On the particular facts of this case, we conclude that Stano's guilty pleas were voluntary, knowing and intelligent.

■ In addition to the constitutional right to counsel in a criminal trial, the Supreme Court has confirmed the right to self-representation accorded a defendant in a state criminal trial under the Sixth and Fourteenth Amendments. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The right to counsel, however, is preeminent over the right to self-representation because the former attaches automatically and must be waived affirmatively to be lost, while the latter does "not attach unless and until it [i]s *asserted.*" *Dorman v. Wainwright*, 798 F.2d 1358, 1366 (11th Cir.1986) (emphasis in original), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987); *Brown v. Wainwright*, 665 F.2d 607, 610 (Former 5th Cir.1982) (en banc); *see Strozier v. Newsome*, 871 F.2d 995, 997 (11th Cir.1989). Only after the voluntary waiver of the constitutional right to counsel by assertion of the right to self-representation does it become incumbent upon the trial court to ascertain that the defendant "knowingly and intelligently" has relinquished the benefits of counsel. *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541 (citing *Johnson*, 304 U.S. at 464–65, 58 S.Ct. at 1023); *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir. 1989).

Under *Faretta*, the assertion of the right to self-representation by the defendant is essential. Faulting the trial judge for forcing a state-appointed public defender upon Faretta, who plainly had informed the court weeks before trial of his desire to proceed pro se, the Supreme Court described Faretta's assertion of his right to self-representation: "Here, weeks before trial, Faretta *clearly and unequivocally* declared to the trial judge that he wanted

to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will." *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541 (emphasis added).[31] In response to this request, the judge conducted a hearing to ascertain Faretta's ability to conduct his own defense. *Faretta*, 422 U.S. at 808, 95 S.Ct. at 2528.

■ Our circuit has explained the minimum actions required of a defendant in order to assert the right to self-representation to the trial court, which then must conduct the requisite inquiry into the waiver of the right to counsel:

To invoke his Sixth Amendment right under *Faretta* a defendant does not need to recite some talismanic formula hoping to open the eyes and ears of the court to his request. Insofar as the desire to proceed pro se is concerned, *petitioner must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made. In this Circuit, the court must then conduct a hearing on the waiver of the right to counsel to determine whether the accused understands the risks of proceeding pro se.*

*Dorman*, 798 F.2d at 1366 (citation omitted) (emphasis added); *see Raulerson v. Wainwright*, 732 F.2d 803, 808 (11th Cir.), *cert. denied*, 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984). Therefore, trial courts are not required to divine when a criminal defendant is proceeding pro se. Under the reasonable person standard, the right to self-representation must be manifested to the trial court by an oral or written request in order to be recognized and to trigger the requisite examination by the court. *See Jackson v. James*, 839 F.2d 1513, 1516 (11th Cir.1988).

Consistent with the clear and unequivocal declaration of the choice to proceed pro

---

**31.** The right to self-representation, established by *Faretta*, is guaranteed by statute in the federal courts and "generally must be timely and unequivocally asserted and accompanied by a valid waiver of counsel." *United States v. Davis*, 604 F.2d 474, 482 n. 8 (7th Cir.1979); 28 U.S.C. § 1654; *see Chapman v. United States*, 553 F.2d 886, 890 (5th Cir.1977).

se required by the Supreme Court in *Faretta,* Eleventh Circuit cases illustrate the specific written or oral request that the defendant must make to the trial court in order to assert the right to self-representation. *See, e.g., Orazio,* 876 F.2d at 1509, 1512 (Defendant-petitioner informed the trial judge that he wanted to represent himself at a hearing pursuant to his court-appointed counsel's request for withdrawal from representation.); *Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1060–61, 1064–65 (11th Cir.1986) (Defendant-petitioner signed a waiver of his right to counsel before the court, stated verbally to the court that he understood that he was waiving his right to an attorney, and reiterated his desire to proceed pro se at a pretrial hearing.); *Dorman,* 798 F.2d at 1360–61, 1366–67 (Defendant-petitioner, citing *Faretta,* filed motions pro se, informed the trial judge by letters and a motion of his desire to have the public defender dismissed and to proceed pro se. He appealed to the state appellate court not only the trial judge's denial of his pro se motions, but also that judge's refusal to discharge the public defender and cited *Faretta.*); *United States v. Edwards,* 716 F.2d 822, 824 (11th Cir.1983) (per curiam) (Defendant-petitioner filed a motion seeking pro se representation and withdrawal of his public defender; the public defender also filed a motion requesting that the defendant be allowed to represent himself.); *see also Raulerson,* 732 F.2d at 809 ("Although a defendant need not 'continually renew his request to represent himself even after it is conclusively denied by the trial judge,' he must pursue the matter diligently." (quoting *Brown,* 665 F.2d at 612)). The *Faretta* case law does not provide for proceeding pro se without assertion of the right to self-representation. There simply is no precedent in this circuit for proceeding pro se by constructive notice without an obvious assertion of the right to self-representation. *See Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.) ("In recognition of the thin line that a district court must traverse in evaluating demands to proceed pro se, and the knowledge that shrewd litigants can exploit this difficult constitu-

tional area by making ambiguous self-representation claims to inject error into the record, *this Court has required an individual to clearly and unequivocally assert the desire to represent himself.*" (footnote omitted) (emphasis added), *cert. denied,* —— U.S. ——, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990).

Once the right of self-representation has been asserted clearly and unequivocally, understandable to the trial court by the reasonable person standard, then and only then is that court, under Supreme Court and Eleventh Circuit case law, required to conduct the requisite inquiry to determine whether the criminal defendant's decision to represent himself is knowing, intelligent and voluntary. *Faretta,* 422 U.S. at 835, 95 S.Ct. at 2541; *Fitzpatrick,* 800 F.2d at 1064–68; *Dorman,* 798 F.2d at 1366. In contrast to the plea inquiry, the trial court conducts a different inquiry of a criminal defendant who has informed the court that he desires to represent himself. *See Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023 (Since a waiver ordinarily requires abandoning a known right or privilege, "[t]he determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused."). The *Faretta* holding has been described as the recognition that "a defendant may elect to act as his or her own advocate," thereby signifying the defense of one's own case. *Jones v. Barnes,* 463 U.S. 745, 751, 103 S.Ct. 3308, 3312, 77 L.Ed.2d 987 (1983).

While the Court has not defined the particulars of a *Faretta* inquiry, this circuit has established the following factors that the trial court should consider in determining whether a criminal defendant is aware of the dangers of proceeding pro se:

"(1) the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; (2) the extent to which the defendant had contact with lawyers prior to the trial; (3) the defendant's knowledge of the nature of the charges, the possible defenses, and the

possible penalty; (4) the defendant's understanding of the rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which he aided the defendant; (7) whether the waiver of counsel was the result of mistreatment or coercion; or (8) whether the defendant was trying to manipulate the events of the trial."

*United States v. Fant,* 890 F.2d 408, 409–10 (11th Cir.1989) (per curiam) (quoting *Strozier,* 871 F.2d at 998), *cert. denied,* —— U.S. ——, 110 S.Ct. 1498, 108 L.Ed.2d 633 (1990); *see Fitzpatrick,* 800 F.2d at 1065–67. These considerations, designed to elicit whether the defendant is capable of conducting his own trial, guide the trial court in its decision concerning the defendant's self-representation. The absence of certain factors, such as previous involvement in criminal trials and appointment of stand-by counsel, may be overcome if the trial court is convinced that the defendant sufficiently understands the disadvantages of proceeding pro se to satisfy the *Faretta* standard. *See Fitzpatrick,* 800 F.2d at 1067. "The ultimate test is not the trial court's express advice, but rather the defendant's understanding." *Id.* at 1065; *see Greene v. United States,* 880 F.2d 1299, 1303–04 (11th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1322, 108 L.Ed.2d 498 (1990). The inquiries required of the trial court obviously differ for determining if a defendant is competent to enter a plea as opposed to representing himself at trial.

■ The actual facts of this case are most significant and completely negate the applicability of *Faretta.* Stano did not proceed pro se because his desired, court-appointed attorney had represented and counseled him since his arraignment. While it should be sufficiently determinative that Stano did not assert or even faintly suggest his right to self-representation, the actions that he did take show that *Faretta* is plainly inapplicable. At his arraignment, Stano agreed to the appointment of Pearl and pled not guilty to the Bickrest and Muldoon murders before Judge Foxman, the same judge before whom he had pled guilty to first-degree murders three times previously. Subsequently, Stano initiated the conference with Pearl and told Pearl that he wanted to plead guilty to the Bickrest and Muldoon murders immediately. Pearl informed Stano that he did not have all discovery from the state, that he had not had time to investigate the cases fully, and that death was the likely sentence.

Nevertheless, Stano speculated that he would receive additional life sentences from Judge Foxman and elected to proceed with the pleas. Pearl explained his advice and Stano's decision to plead to Judge Foxman at the March 11, 1983 plea proceedings, preliminary to the actual plea taking. In response to Judge Foxman's questioning, Stano agreed with Pearl's representations. There was no need for the trial court to conduct a *Faretta* inquiry. Based upon Stano's history of pleading guilty and his actions in this case, it was and is patently apparent that he never envisioned representing himself and proceeding to trial.

■ *Faretta* explains that an attorney, "however expert, is still an assistant." [32]

32. *Faretta* clarifies the counsel's role as assistant to the accused:

The counsel provision supplements this design [of self-representation implied in the Sixth Amendment]. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. This allocation can only be justified, however, by the defendant's consent, at the outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense

422 U.S. at 820, 95 S.Ct. at 2533; *see Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984). Even a defendant who hires trial counsel for the purpose of making strategic decisions does not relinquish to his attorney final authority to make fundamental decisions, such as the plea that he will enter.[33] *See Jones,* 463 U.S. at 751, 103 S.Ct. at 3312 ("[T]he accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal." (citing *Wainwright v. Sykes,* 433 U.S. 72, 93 n. 1, 97 S.Ct. 2497, 2510 n. 1, 53 L.Ed.2d 594 (1977) (Burger, C.J., concurring); ABA Standards for Criminal Justice 4–5.2, 21–2.2 (2d ed. 1980)); *Faretta,* 422 U.S. at 834, 95 S.Ct. at 2541 ("The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who

must be free personally to decide whether in this particular case counsel is to his advantage."); *United States v. Joshi,* 896 F.2d 1303, 1307 (11th Cir.) ("Among those rights that a defendant must personally waive are the right to go to trial or plead guilty...." (citing *Boykin,* 395 U.S. at 242, 89 S.Ct. at 1711)), *cert. denied,* — U.S. —, 111 S.Ct. 523, 112 L.Ed.2d 534 (1990); *Poole v. United States,* 832 F.2d 561, 563–64 (11th Cir.1987) (Because the trial judge must be assured that a guilty plea is made intelligently and voluntarily, "a guilty plea cannot be entered against a defendant 'solely on the consent of the defendant's agent—his lawyer.'" (quoting *Henderson,* 426 U.S. at 650, 96 S.Ct. at 2260) (White, J., concurring)), *cert. denied,* 488 U.S. 817, 109 S.Ct. 54, 102 L.Ed.2d 33 (1988); *cf. Brookhart v. Janis,* 384 U.S. 1, 7, 86 S.Ct. 1245, 1248, 16 L.Ed.2d 314 (1966) ("Our question therefore narrows down to

guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense.
*Faretta,* 422 U.S. at 820–21, 95 S.Ct. at 2533–34 (citations and footnote omitted) (emphasis in original).

**33.** The American Bar Association (ABA) Model Code of Professional Responsibility explains that decisions affecting the merits of the case or substantially prejudicing the rights of a client, including entry of a plea, belong to the client:

> EC 7–7 In certain areas of legal representation not affecting the merits of the cause or substantially prejudicing the rights of a client, a lawyer is entitled to make decisions on his own. But otherwise the authority to make decisions is exclusively that of the client and, if made within the framework of the law, such decisions are binding on his lawyer.... A defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable *and as to the prospects of success on* appeal, but *it is for the client to decide what plea should be entered* and whether an appeal should be taken.

ABA Model Code of Professional Responsibility, Canon 7, Ethical Consideration 7–7 (1980) (emphasis added). Although the ABA replaced the Model Code of Professional Responsibility with the ABA Model Rules of Professional Conduct in August, 1983, the Model Code of Professional Responsibility, as adopted by the Florida Supreme Court, was in effect in Florida when Stano entered his guilty pleas on March 11, 1983. *Cf.* ABA Model Rules of Professional Responsibility, Rule 1.2(a) ("A lawyer shall abide by a client's decisions concerning the objectives

of representation ... and shall consult with the client as to the means by which they are to be pursued."). As adopted by the Florida Supreme Court on January 1, 1987, the ABA Model Rules of Professional Responsibility presently are effective in Florida. *Florida Bar Re Rules Regulating the Florida Bar,* 494 So.2d 977 (Fla.) (per curiam), *modified on other grounds,* 507 So.2d 1366 (Fla.1986).

The role of counsel in a *Faretta* situation has been analogized to the tort doctrine of informed consent: patients/clients must be informed of the material risks prior to electing particular medical treatment/legal action, but the patient/client can refuse treatment/action once informed of those risks. Chused, *Faretta and the Personal Defense: The Role of a Represented Defendant in Trial Tactics,* 65 Calif.L.Rev. 636, 669–70 (1977). "The general rule is that control of trial decisions rests with counsel in all areas *except the guilty plea* and perhaps some other 'fundamental' decisions." *Id.* at 655 (emphasis added). The legal and political processes also have been compared because the client's claim (or fundamental decisions regarding his case) are considered to be his just as a citizen's vote is his. *Speigel, Lawyering and Client Decisionmaking: Informed Consent and the Legal Profession,* 128 U.Pa.L.Rev. 41, 74 (1979). The case belongs to the client and "this claim of ownership gives the client a presumptive right of control." *Id.* at 73. While an attorney's education and experience give him superior knowledge of generalized technical information, "[t]he client possesses superior knowledge of another sort—knowledge of the facts and circumstances of his case." *Id.* at 100.

whether counsel has power to enter a plea which is inconsistent with his client's expressed desire and thereby waive his client's constitutional right to plead not guilty and have a trial in which he can confront and cross-examine the witnesses against him. We hold that the constitutional rights of a defendant cannot be waived by his counsel under such circumstances."). The defendant remains the master of his case, particularly with respect to the entry of a guilty plea.[34]

 Stano made deliberate choices in this case. He chose to have counsel, and never waived his right to counsel in any way whatsoever. He had advice from an experienced and conscientious attorney, who had represented him previously for first-degree murder pleas. Against the advice of counsel, he elected to change his pleas to guilty before Judge Foxman, who had accepted from Stano three previous guilty pleas to first-degree murders. Far from desiring additional counsel, Stano testified, when examined by Judge Foxman, that he was satisfied with Pearl's representation, and that he had no questions for him.

The former Fifth Circuit clarified that the analyses for a guilty plea and waiver of counsel are distinct. *Lewellyn v. Wainwright,* 593 F.2d 15 (5th Cir.1979) (per curiam). In *Lewellyn,* the habeas corpus petitioner signed a waiver of counsel form before he was arraigned in a state trial court in the Middle District of Florida. He then entered a plea of guilty to a felony charge. The parties agreed that the petitioner was not informed by the trial judge or the prosecutor of the maximum sentence that could be imposed. Sentenced to imprisonment for six months to twenty years, the petitioner took no direct appeal. He filed a motion to vacate the judgment and sentence, and alleged that his guilty plea was invalid because he had not been advised of the consequences.

Following an evidentiary hearing on the federal habeas corpus petition, the magistrate concluded that petitioner's waiver of counsel was valid, but that his guilty plea was not made knowingly and intelligently. The magistrate reasoned that, because the petitioner was ignorant of the potential sentence at the time he pled, the plea could not have been entered knowingly and intelligently. Determining that the failure of the state trial judge to ascertain whether the petitioner knew the maximum sentence that he could incur rendered his guilty plea unintelligent and was a denial of due process, the district court adopted the magistrate's report and recommendation and granted the writ. The judgment and sentence subsequently were vacated.

On appeal, the State of Florida contended that the district court erred in finding a due process violation because the petitioner's valid waiver of his right to counsel also waived any claim that the entry of his guilty plea was deficient. The state argued that the *Boykin* requirement that guilty pleas be knowing and voluntary was modified by *Faretta,* which stated that a defendant electing to defend himself cannot complain on appeal that the quality of his defense amounted to a denial of effective assistance of counsel. *Id.* at 16; *see Faretta,* 422 U.S. at 834 n. 46, 95 S.Ct. at 2541 n. 46. Acknowledging that *Faretta* mandates that a waiver of counsel not only must be made knowingly and intelligently by the defendant, but also that the trial court must caution the defendant regarding the dangers and disadvantages of self-representation so that an intelligent choice can be made, the court distinguished the self-representation and plea inquiries by

---

**34.** The Seventh Circuit has described the decision to plead guilty as being the sole prerogative of the defendant:

It is undisputed that a defendant has a constitutional right to participate in the making of certain decisions which are fundamental to his defense. Included among these fundamental choices are the decisions to forgo the assistance of counsel and to waive trial by jury. Similarly, *the decision to plead guilty is*

one that must be made by the defendant, and is not one in which an attorney may speak for his client without consultation.

*Johnson v. Duckworth,* 793 F.2d 898, 900 (7th Cir.) (citations omitted) (emphasis added), *cert. denied,* 479 U.S. 937, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986); *see Faretta,* 422 U.S. at 820–21, 95 S.Ct. at 2534 (The allocation of decisionmaking power must be with the defendant's consent.).

the trial court: "The state's reliance on *Faretta* is unfounded. *Faretta* addressed the constitutional origins of the right of self-representation; *it does not address, much less hint at, the requirement for a valid guilty plea.*" *Lewellyn,* 593 F.2d at 16 (emphasis added).

Against his attorney's advice, Stano speculated that he would receive life sentences from Judge Foxman if he pled guilty to the Bickrest and Muldoon murders, because that judge had not sentenced him to death for three previous guilty pleas to first-degree murders. *See LoConte,* 847 F.2d at 752–53 ("[F]or his own reasons—to save himself from a possible death sentence and to secure the release of his wife," the defendant pled guilty.); *Johnson v. United States,* 838 F.2d 201, 204 (7th Cir.1988) (Viewing his opportunities of seeking a reduction of sentence in the district court as "superior" to pursuing an appeal, the defendant's "choice was impelled by the attractiveness of an opportunity and not the terror of the alternative."). Stano gambled and lost; he cannot challenge his election to plead guilty retrospectively because the sentences were not as he had expected. The decision to plead guilty was his to make, and we do not review the prudence of his decision.[35] We review Stano's guilty

pleas only to determine if they met the constitutional due process requirements of being knowing, intelligent and voluntary. We have concluded that his pleas satisfy these constitutional requisites.

In contrast, the inquiry by the trial court when a defendant has asserted his Sixth Amendment right to self-representation serves a distinctly different purpose. Because the right to counsel is so precious to our jurisprudence, the waiver of this right must be asserted.[36] The trial court's inquiry into a knowing, intelligent and voluntary decision to proceed pro se under *Faretta* is tailored to elicit whether the defendant is capable of conducting his own defense.[37] In this circuit, the defendant is questioned specifically regarding his knowledge of the rules of procedure, evidence and courtroom decorum.

By definition, a defendant who pleads guilty relinquishes his defense. He, therefore, does not need to be examined as to his understanding of courtroom procedure. While the due process knowing, intelligent and voluntary plea taking questions are subsumed in a *Faretta* examination, a more extensive colloquy must transpire in order for the trial court to satisfy itself that the defendant is aware of the

---

**35.** This court has spoken clearly regarding the less than prudent, but nevertheless voluntary guilty plea of a defendant:

> In the final analysis, the appellant chose voluntarily to enter a guilty plea for his own personal reasons. Not only was he seeking his own wife's release in Louisiana, he believed that the "biker's code" required him to help Ignazio [codefendant] and Ignazio's wife. Furthermore, appellant benefited himself with the plea by avoiding a possible death sentence. Appellant was convinced by Ignazio's ill-conceived notion that the guilty pleas could be subsequently attacked and set aside on the basis of coercion and, therefore, knowingly and voluntarily entered into this "plan" by Ignazio to gain the immediate release of their wives while reserving a later attack upon their own guilty pleas. *The fact that the plan was foolish and stupid does not mean that the guilty pleas entered pursuant to it were involuntary in a constitutional sense.* Whether the appellant chose to enter this plea out of a desire to help his friends, his wife, and himself, or out of a mistaken notion that he could escape its consequences at a later time, we agree with the district court's conclusion that

appellant chose to do so out of his own free and voluntary will.
*LoConte,* 847 F.2d at 753 (emphasis added).

**36.** This court has stressed the necessity of asserting the right to self-representation:

> This case presents another example of the tension between the right to counsel and the right to self-representation. Because the assertion of one necessitates the waiver of the other, it is essential that trial courts carefully create a record that ensures that the decision to proceed pro se is being made knowingly, intelligently, and voluntarily.
*Fant,* 890 F.2d at 410.

**37.** *Faretta* explains that the Sixth Amendment right to self-representation is the defendant's right to proceed pro se in conducting his trial: "And although he may *conduct his own defense* ultimately to his own detriment, this choice must be honored out of 'that respect for the individual which is the lifeblood of the law.'" 422 U.S. at 834, 95 S.Ct. at 2541 (quoting *Illinois v. Allen,* 397 U.S. 337, 350–51, 90 S.Ct. 1057, 1064, 25 L.Ed.2d 353 (1970) (Brennan, J., concurring)) (emphasis added).

dangers of conducting his own defense. Under Supreme Court and binding circuit precedent, the *Faretta* inquiry is reserved for advising a defendant of the disadvantages of proceeding pro se at trial; the plea inquiry is employed for determining whether a defendant's plea is knowing, intelligent and voluntary sufficient to meet constitutional due process.

## B. Determining Ineffective Assistance of Counsel in Guilty Plea Proceedings

Stano's claim of ineffective assistance of counsel requires our constitutional scrutiny of Pearl's representation and advice concerning the plea proceedings. The Sixth Amendment right to counsel implicitly includes the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 & n. 14, 90 S.Ct. 1441, 1449 & n. 14, 25 L.Ed.2d 763 (1970); *Chatom v. White*, 858 F.2d 1479, 1484 (11th Cir.1988), *cert. denied*, 489 U.S. 1054, 109 S.Ct. 1316, 103 L.Ed.2d 585 (1989); *see Powell v. Alabama*, 287 U.S. 45, 53, 53 S.Ct. 55, 58, 77 L.Ed. 158 (1932). A defendant is entitled to this constitutional guarantee of effective assistance of counsel whether he is represented by a retained or court-appointed attorney. *Scott v. Wainwright*, 698 F.2d 427, 429 (11th Cir.1983). In our review of Stano's allegation of ineffective assistance of counsel, we are not bound by the determination of the Florida courts or the federal district court. *Gates v. Zant*, 863 F.2d 1492, 1496 (11th Cir.) (per curiam), *cert. denied*, — U.S. —, 110 S.Ct. 353, 107 L.Ed.2d 340 (1989).

"A guilty plea is open to attack on the ground that counsel did not provide the defendant with 'reasonably competent advice.'" *Cuyler v. Sullivan*, 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980) (quoting *McMann*, 397 U.S. at 770, 90 S.Ct. at 1448). The Supreme Court has held "that the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel." *Hill v. Lockhart*, 474 U.S. 52, 58, 106 S.Ct. 366, 370, 88 L.Ed.2d 203 (1985); *Slicker v. Dugger*, 878 F.2d 1380, 1381 n. 1 (11th Cir.1989) (per curiam); *Holmes v. United States*, 876 F.2d 1545,

1551 (11th Cir.1989); *McCoy v. Wainwright*, 804 F.2d 1196, 1198 (11th Cir.1986) (per curiam). In order to obtain relief under the familiar *Strickland* test, a usual basis of appeal in habeas corpus petitions, a convicted defendant complaining of ineffective assistance of counsel must show: 1) "that counsel's representation fell below an objective standard of reasonableness," and 2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984); *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir.1989) (per curiam); *see Futch v. Dugger*, 874 F.2d 1483, 1486 (11th Cir.1989); *Tafero v. Wainwright*, 796 F.2d 1314, 1319 (11th Cir.1986) (per curiam), *cert. denied*, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 782 (1987). Without both showings, a defendant's conviction or death sentence cannot be attributed to "a breakdown in the adversary process that renders the result unreliable." *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064.

Under the first part of the *Strickland* test, "the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." 466 U.S. at 688, 104 S.Ct. at 2065. As a corollary, the appropriate standard for evaluating counsel's pretrial investigation is "reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691, 104 S.Ct. at 2066; *Foster v. Dugger*, 823 F.2d 402, 405 (11th Cir.1987), *cert. denied*, 487 U.S. 1241, 108 S.Ct. 2915, 101 L.Ed.2d 946 (1988); *see Greene v. United States*, 880 F.2d 1299, 1306 (11th Cir.1989), *cert. denied*, — U.S. —, 110 S.Ct. 1322, 108 L.Ed.2d 498 (1990); *Futch*, 874 F.2d at 1486; *see also Chatom*, 858 F.2d at 1485 (11th Cir.1988) ("Counsel's representation must be shown to fall below an objective standard of reasonableness."). The Court also noted that an attorney had an obligation "to consult with the defendant on important decisions and to keep the defendant informed of important developments

in the course of the prosecution." *Strickland*, 466 U.S. at 688, 104 S.Ct. at 2065. The Court, however, recognized that "[j]udicial scrutiny of counsel's performance must be highly deferential," and that courts should make certain "that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689, 104 S.Ct. at 2065; *Foster*, 823 F.2d at 405. In order to succeed on an ineffective assistance of counsel claim, a defendant must surmount "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065; *Chatom*, 858 F.2d at 1485.

Overcoming the first part of the *Strickland* test does not guarantee relief. Regarding the second part of the test, the Court has recognized that "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066. Moreover, *Hill* clarified the *Strickland* second or "prejudice" requirement in the context of guilty pleas: "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." 474 U.S. at 59, 106 S.Ct. at 370; *Tahamtani v. Lankford*, 846 F.2d 712, 714 (11th Cir.1988) (per curiam); *see Long v. United States*, 883 F.2d 966, 968 n. 4 (11th Cir.1989) (per curiam); *Agan v. Dugger*, 835 F.2d 1337, 1340 n. 6 (11th Cir.1987), *cert. denied*, 487 U.S. 1205, 108 S.Ct. 2846, 101 L.Ed.2d 884 (1988); *see also Holmes*, 876 F.2d at 1553, *Slicker v. Wainwright*, 809 F.2d 768, 770 (11th Cir.1987) (These cases were remanded to the district court to determine if accurate, rather than incorrect, information by the defense counsel as to the length of sentence would have changed the defendant's plea.); *cf. Betancourt v. Willis*, 814 F.2d 1546, 1549 (11th Cir.1987) (This court

affirmed the district court's granting a habeas corpus petition based upon its conclusion that petitioner's plea was not voluntary and that his counsel provided ineffective assistance because the evidence was "uncontroverted that petitioner was completely unaware of the ultimate consequences of his plea because his counsel misrepresented the existence of a sentence reduction agreement."). The *Hill* court explained the prejudice requirement with specific regard to a defense counsel's alleged failure to investigate potentially exculpatory evidence:

> In many guilty plea cases, the "prejudice" inquiry will closely resemble the inquiry engaged in by courts reviewing ineffective-assistance challenges to convictions obtained through a trial. For example, where the alleged error of counsel is a failure to investigate or discover potentially exculpatory evidence, the determination whether the error "prejudiced" the defendant by causing him to plead guilty rather than go to trial will depend on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea. This assessment, in turn, will depend in large part on a prediction whether the evidence likely would have changed the outcome of a trial.

474 U.S. at 59, 106 S.Ct. at 370; *McCoy*, 804 F.2d at 1198–99.

■ The Supreme Court has given finality to guilty pleas by precluding claims of constitutional deprivations occurring prior to entry of the plea. *Tollett v. Henderson*, 411 U.S. 258, 267, 93 S.Ct. 1602, 1608, 36 L.Ed.2d 235 (1973); *see Tiemens v. United States*, 724 F.2d 928, 929 (11th Cir.) (per curiam) ("[A] guilty plea waives all nonjurisdictional defects occurring prior to the time of the plea, including violations of the defendant's rights to a speedy trial and due process."), *cert. denied*, 469 U.S. 837, 105 S.Ct. 134, 83 L.Ed.2d 74 (1984). The Court allows only challenges to the voluntary and intelligent entry of the plea if a convicted defendant can prove "serious derelictions" in his

counsel's advice regarding the plea.[38] *McMann,* 397 U.S. at 774, 90 S.Ct. at 1450; *Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608; see *Hill,* 474 U.S. at 56, 106 S.Ct. at 369 ("The longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.' " (quoting *North Carolina v. Alford,* 400 U.S. 25, 31, 91 S.Ct. 160, 164, 27 L.Ed.2d 162 (1970)). Without "reasonably effective assistance of counsel in connection with the decision to plead guilty," a defendant cannot enter a knowing and voluntary plea because the plea does not represent an informed choice. *McCoy,* 804 F.2d at 1198; *Scott,* 698 F.2d at 429. Based upon his familiarity with the facts and law, defense counsel must advise the defendant. *Scott,* 698 F.2d at 429. "Counsel's advice need not be errorless, and need not involve every conceivable defense, no matter how peripheral to the normal focus of counsel's inquiry, but *it must be within the realm of competence demanded of attorneys representing criminal defendants." Id.* (emphasis added); see *McMann,* 397 U.S. at 771, 90 S.Ct. at 1449; *Long,* 883 F.2d at 969.

The Supreme Court has recognized that the decision to plead guilty may occur without all of the state's evidence and necessarily takes place without knowledge of all facts revealed by witnesses at trial. *McMann,* 397 U.S. at 769–70, 90 S.Ct. at 1448. "[C]ounsel owes a lesser duty to a client who pleads guilty than to one who decides to go to trial, and in the former case counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir.1984) (per curiam); *Downs–Morgan v. United States,* 765 F.2d 1534, 1539 (11th Cir.1985). An attorney's responsibility is to investigate and to evaluate his client's options in the course of the subject legal proceedings and then to advise the client as to the merits of each. *Tafero,* 796 F.2d at 1320; *Thompson v. Wainwright,* 787 F.2d 1447, 1451 (11th Cir.1986), *cert. denied,* 481 U.S. 1042, 107 S.Ct. 1986, 95 L.Ed.2d 825 (1987). When a defendant preempts his attorney's defense strategy, he thereafter cannot claim ineffective assistance of counsel. *Mitchell v. Kemp,* 762 F.2d 886, 889 (11th Cir.1985), *cert. denied,* 483 U.S. 1026, 107 S.Ct. 3248, 97 L.Ed.2d 774 (1987); see *Thompson,* 787 F.2d at 1452; *Foster v. Strickland,* 707 F.2d 1339, 1343–44 (11th Cir.1983), *cert. denied,* 466 U.S. 993, 104 S.Ct. 2375, 80 L.Ed.2d 847 (1984); see also *Alvord v. Wainwright,* 725 F.2d 1282, 1289 (11th Cir.), *cert. denied,* 469 U.S. 956, 105 S.Ct. 355, 83 L.Ed.2d 291 (1984) (An attorney ethically is bound to follow a competent client's decision regarding the defense of his case.). A defendant may partially waive his right to counsel by insisting on a course of conduct contrary to advice by his counsel. See *Tafero,* 796 F.2d at 1320; *Mitchell,* 762 F.2d at 889–90; *Foster,* 707 F.2d at 1343–44.

Applying these legal principles to this case, we note that, following his appointment at Stano's arraignment through the critical stages of pleading and sentencing, Pearl counseled Stano regarding the state's case against him. When Stano told Pearl that he wanted to plead guilty to the Bickrest and Muldoon murders, Pearl gave Stano most appropriate advice: Stano should refrain from pleading guilty because all discovery had not been received from the state and the death penalty would be the probable result. He stressed to Stano that he had been unable to investigate the cases

---

**38.** The Supreme Court has explained the finality of a guilty plea with the exception of the voluntary and intelligent character of the plea as follows:

[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in *McMann.*

*Tollett,* 411 U.S. at 267, 93 S.Ct. at 1608.

completely without all of the state's evidence. Pearl informed Stano of the defense theories of proportionality and insanity that he wanted to pursue. Pearl's investigation subsequent to the pleas, including Stano's examination by mental health experts, revealed no grounds on which to attack Stano's confessions or to withdraw his pleas.

 Stano's allegation of ineffective assistance of counsel as to Pearl's representation at the plea proceedings is based upon his failure to have reviewed all of the state's evidence. Not only did Pearl advise Stano not to plead guilty because he had not had the opportunity to review this evidence, but also the unreceived similar fact discovery about which he complains was received prior to sentencing. If this discovery had constituted a basis for attacking the pleas, then Pearl could have made a motion to set aside the pleas prior to sentencing.

Ironically, the state abandoned the theory that this discovery was to support. The absent evidence, therefore, is meaningless. Consequently, this discovery, unreviewed by Pearl at the entry of the pleas, could not have resulted in Stano's decision to go to trial instead of pleading guilty and would not have affected his sentence. *See Zamora v. Dugger*, 834 F.2d 956 (11th Cir.1987) (This court affirmed the district court's denial of habeas corpus relief because none of petitioner's allegations of ineffective assistance of counsel would have caused the jury verdict to be unreliable.).

Stano was not acting without reasoned advice from a highly experienced criminal defense attorney; he simply refused to take that counsel advise. Under the circumstances, Pearl gave Stano proper advice well within the competence of a criminal defense attorney. There was nothing more that he could have done. The decision whether to plead guilty, however, belonged to Stano. He apparently believed, against Pearl's advice, that he would receive life sentences if he pled guilty.

 The record of the plea proceedings also contradicts any subsequent claim by Stano that Pearl's representation was defi-

cient. When questioned by Judge Foxman, Stano agreed with Pearl's preliminary statement regarding his desire to plead guilty despite the lack of receipt of all evidence from the state. Stano also admitted during the plea proceedings that his plea was voluntary, that he was satisfied with the services of Pearl, that he had no complaints regarding Pearl's representation, and that he had no questions for Pearl. Stano's competence is not at issue. His guilty pleas were entered voluntarily, knowingly and intelligently. Pearl's advice was to the contrary. Proceeding *against* counsel's advice is not proceeding *without* counsel's advice. Under our deferential review and considering all the facts in this case, we cannot find that Pearl's representation of Stano with respect to the plea proceedings was below an objective standard of reasonableness for a criminal defense attorney.

In *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), the Supreme Court created an exception to the *Strickland* standard for ineffective assistance of counsel and acknowledged that certain circumstances are so egregiously prejudicial that ineffective assistance of counsel will be presumed. 466 U.S. at 658, 104 S.Ct. at 2046. This companion case to *Strickland* explains its applicability by the examples of complete denial of counsel, absence of counsel at a critical stage, and defense counsel's total failure to test significantly the prosecution's case. *Cronic*, 466 U.S. at 659, 104 S.Ct. at 2047; *see Harding v. Davis*, 878 F.2d 1341, 1345 (11th Cir.1989); *Heath*, 863 F.2d at 821; *Warner v. Ford*, 752 F.2d 622, 624 (11th Cir.1985); *see also Chadwick v. Green*, 740 F.2d 897, 901 (11th Cir.1984) (Failure of counsel "to investigate and pursue all avenues of defense" more appropriately is analyzed under *Strickland* "rather than as a fundamental breakdown of the adversarial process such that prejudice is presumed under *Cronic*.") The crux of *Cronic* is that the right to effective assistance of counsel is "the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial test-

ing." 466 U.S. at 656, 104 S.Ct. at 2045. Citing *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), as an example of a situation causing a presumption of prejudice despite the presence of competent counsel, the Court admonishes that "[a]part from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 U.S. at 659 n. 26, 104 S.Ct. at 2047 n. 26; *see Chadwick*, 740 F.2d at 900 (*Powell* presents the "rare case" where prejudice is presumed.).

Furthermore, this circuit has held that " '*Cronic* represents a narrow exception which the Supreme Court has carved out of the general rule that a petitioner claiming ineffective assistance of counsel must demonstrate that he was prejudiced by specific alleged errors in his counsel's performance. *Consequently, the burden of proof under Cronic is a very heavy one.*' " *Stone v. Dugger*, 837 F.2d 1477, 1479 (11th Cir.1988) (per curiam) (quoting *Smith v. Wainwright*, 777 F.2d 609, 620 (11th Cir.1985) (emphasis in original), *cert. denied*, 477 U.S. 905, 106 S.Ct. 3275, 91 L.Ed.2d 565 (1986)), *cert. denied*, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 821 (1989); *Harding*, 878 F.2d at 1345; *Chadwick*, 740 F.2d at 900. Comparing *Cronic* and

*Strickland*, this court has concluded that "it becomes evident that *Cronic's* presumption of prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in effect denied any meaningful assistance at all." [39] *Chadwick*, 740 F.2d at 901.

The juxtaposition of the facts of the Court's example, *Powell*, and *Cronic* makes evident the factual circumstances required for the application of the *Cronic* exception. In *Powell*, an out-of-state attorney initially appeared on behalf of multiple defendants on the day of trial. Although the case was a highly publicized capital crime, the court decided to proceed with trial immediately and provided the out-of-state attorney with the assistance of the local bar. Under such circumstances, the Court found that the likelihood that counsel could have performed effectively was so remote as to make the trial inherently unfair.

In *Cronic*, the defendant in a complex check kiting case claimed that he was prejudiced by representation by a young, court-appointed, real estate attorney, who had never tried a jury case and was allowed only twenty-five days for pretrial preparation, as opposed to four and one-half years that the government had to investigate and prepare the case. Rejecting the contention that a presumption of prejudice resulted because of the lawyer's youth and inexperi-

---

**39.** *Compare Chatom*, 858 F.2d at 1484–87 (Stressing that it is the exceptional situation when a single error by counsel will rise to the level of ineffective assistance of counsel under *Cronic*, this court determined that counsel's failure to object to the results of an atomic absorption test, used by the state to show that petitioner's accomplice did not fire the gun which killed two sheriff's deputies, fell below reasonable standards of performance and prejudiced Sixth Amendment adversarial testing. Because the state's case against petitioner consisted of circumstantial evidence, the test evidence could have supported damaging inferences by the jury. Additionally, the issue of improper admission of the test was foreclosed on appeal. In granting habeas corpus relief, this court concluded that admission of the test results manifestly influenced the verdict, which reasonably may have been different absent this evidence.) *with Kelly v. United States*, 820 F.2d 1173 (11th Cir.) (per curiam) (Petitioner, convicted for drug offenses, moved to vacate his sentence

based on ineffective assistance of counsel. Petitioner alleged conflict of interest between himself and his trial attorney, who subsequently pled guilty to drug charges in another federal case and testified against petitioner; inadequate time for trial preparation because petitioner retained his trial counsel two days before the trial began (petitioner's original counsel, who also represented one of his codefendants, was the target of a continuing criminal investigation which resulted in petitioner's indictment); substandard representation because his trial counsel was a drug addict; and unreasonable trial strategy by his attorney. Affirming the district court's denial of petitioner's motion, this court concluded that petitioner did not show that his attorney's performance undermined the trial result under the *Strickland* test and was convinced that the facts did not create a presumption of prejudice sufficient for the narrow *Cronic* exception.), *cert. denied*, 484 U.S. 966, 108 S.Ct. 458, 98 L.Ed.2d 398 (1987).

ence, the Supreme Court stated that "[e]very experienced criminal defense attorney once tried his first criminal case," and found that the case was "not one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel." *Cronic*, 466 U.S. at 665–66, 104 S.Ct. at 2050–51. In rejecting the claim of denial of the Sixth Amendment right to counsel, the *Cronic* reference to *Powell*, with its unique and blatant facts creating a presumption of ineffective assistance of counsel, makes evident that exceptions to the *Strickland* standard are appropriate only when the circumstances would offend basic concepts of due process. When such prejudicial circumstances exist, the concern is with procedural fair trial requirements, and not with whether the defendant would have been found guilty.

Comparing the facts of this case to *Powell* and *Cronic* obviously shows that Stano's plea proceedings do not approach the *Cronic* exception to the *Strickland* standard for ineffective assistance of counsel. If the inexperience and youth of the *Cronic* attorney were found to be effective assistance of counsel, then certainly Pearl, an experienced public defender who had represented 300 death penalty defendants in approximately 75 trials, was exceptionally qualified to provide Stano effective assistance of counsel. As we have found, Pearl gave Stano appropriate advice regarding the guilty pleas that Stano elected to enter. Stano was not forced into his decision by circumstances that are so inherently unfair as to transgress due process.

Cronic recognizes that "because we presume that the lawyer is competent to provide the guiding hand that the defendant needs, the burden rests on the accused to demonstrate a constitutional violation." 466 U.S. at 658, 104 S.Ct. at 2046 (citing *Michel v. Louisiana*, 350 U.S. 91, 100–01, 76 S.Ct. 158, 163–64, 100 L.Ed. 83 (1955)). Stano plainly has not met the prejudice requirement of *Hill/Strickland* by demonstrating that, *but for* Pearl's assistance, he would not have entered guilty pleas in the Bickrest and Muldoon cases and would have insisted on going to trial.

Stano's ineffective assistance of counsel claim has been reviewed in the state courts and thoroughly examined in an evidentiary hearing in federal district court to no avail. The Florida Supreme Court, relying on *Hill/Strickland*, aptly describes the inadequacy of Stano's allegation of ineffective assistance of counsel:

> By insisting on pleading guilty and by telling counsel that he had confessed freely and voluntarily, Stano rendered any further investigation pointless. Stano had been found competent to stand trial and, therefore, competent to assist in his defense. We cannot see how acceding to the wishes of a competent client could or should be construed as ineffectiveness years after the fact and only when execution of sentence is imminent. The record conclusively demonstrates no substandard performance by Stano's counsel regarding his investigation.

*Stano v. State*, 520 So.2d 278, 280–81 (Fla. 1988) (per curiam). We also find no merit to Stano's Sixth Amendment claim of ineffective assistance of counsel. We conclude that a competent, knowledgeable defendant can make an informed, voluntary choice to plead guilty and that he subsequently cannot fault his attorney for ineffective assistance of counsel after receiving an unexpected sentence.

## III. CONCLUSION

After rehearing Stano's Sixth Amendment claims en banc, we conclude that he has not raised a constitutionally cognizable issue on this record under either self-representation or ineffective assistance of counsel analysis. We refer all other appellate issues presented by Stano to the original panel for resolution. The decision of the district court to deny Stano habeas corpus relief with respect to his Sixth Amendment claims is AFFIRMED.

ANDERSON, Circuit Judge, concurring, in which KRAVITCH, Circuit Judge, joins:

I join Part II.B. of Judge Fay's opinion holding that Stano's claim of ineffective

assistance of counsel has no merit. I also join in that portion of Part II.A. of Judge Fay's opinion holding that the circumstances of this case did not trigger the procedures outlined in *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In other words, I join all of the opinion, except I do not join any dicta suggesting that the *Faretta* right is inapplicable to the guilty plea stage.

TJOFLAT, Chief Judge, dissenting, in which JOHNSON, Circuit Judge, joins:

I respectfully dissent from the court's decision today. That decision emphasizes that a defendant has a right to plead guilty, and to do so even against a lawyer's advice. I agree. The majority, however, misses the point of this case: the petitioner pled guilty *without* the advice of counsel. The petitioner's nominal lawyer failed to undertake even the most minimal inquiry necessary to constitute assistance of counsel. Of course, a defendant who has invoked his right to counsel still has the right to plead guilty without counsel, but before the court can accept his plea, the court must ensure that the defendant unequivocally asserts his right to proceed pro se and knowingly and intelligently waives his right to counsel. Absent such a waiver, the court has an obligation not to accept the plea until the defendant has assistance of counsel. In my view, the court in this case failed to discharge that obligation: it accepted the pleas of an uncounseled defendant without ensuring that the defendant clearly and unequivocally asserted his right to proceed pro se and knowingly and intelligently waived his right to counsel. Accordingly, the petitioner's convictions must be set aside.

## I.

In 1982, Gerald Eugene Stano confessed to the murders of Susan Bickrest and Mary Kathleen Muldoon. In early 1983, a Florida grand jury indicted him for both murders. On March 11, 1983, Stano, accompanied by his court-appointed attorney, Howard B. Pearl, pled guilty to both charges. After a brief exchange with Pearl and Sta-

no, the trial judge accepted the guilty pleas. Three months later, the judge sentenced Stano to death in both cases.

The Supreme Court of Florida affirmed the convictions and sentences on direct appeal, and the state courts denied Stano post-conviction relief. The district court also denied Stano's petition for a writ of habeas corpus. On appeal, a panel of this court granted Stano relief. A majority of this court, however, voted to hear the case en banc and the panel's decision was vacated. The court today affirms the district court's denial of relief.

The plea hearing now at issue commenced with an exchange between Mr. Pearl and the court that is crucial to the case before this court. In the course of this exchange, Mr. Pearl told the court that he had not yet received discovery from the State and therefore he could not give Stano any informed advice on how to plead. The exchange was as follows:

MR. PEARL: Before proceeding, Your Honor, as I have told Mr. Stano I would do, there are a couple of things I would like to inform the Court about in his presence that might appropriately be made a part of the plea dialogue.

At this time, Your Honor, I have not yet received full discovery from the state with respect to these cases and, therefore, *am not prepared to say that I know all of the substantive facts concerning these two killings.* The delay has been because much of the materials have not yet been received by the State and [the prosecutor] told me he would like to gather everything up at once and submit it to me rather than in installments. I agreed with that.

THE COURT: So, you're not complaining, you're just stating this for the record.

MR. PEARL: No, that is not a complaint. I'm just making my position clear in Mr. Stano's presence about the entry of his plea; that is to say, that *I am not fully prepared to advise him as to whether the State has sufficient evidence to convict him or not.* He is convinced that they do.

I have spoken with [the prosecutor]. I have confidence, certainly, in his integrity and honesty, and he assures me that the State can independently establish the corpus delicti in both of these cases. And Mr. Stano tells me that is so.

Further, I have asked [Stano] about the admissions or confessions that he has made to Detective Paul Crow. And he assures me that those statements were made voluntarily, they were made competently, and intelligently after warning of his rights and that, therefore, there does not exist a good possibility that either of his admissions could be suppressed on a hearing.

He feels that he wants to go forward and enter this plea rather than go through a trial or even a delay at this time.

I have agreed that certainly he has the right to do so, but that he should know, and it should be on the record, that *I am not fully prepared at this time as his attorney to advise him with respect to the advisability of a trial or not.*

He tells me he does not want a trial.

THE COURT: Okay.

Mr. Stano, do you care to comment on what Mr. Pearl has just said?

THE DEFENDANT: No. I believe everything was quite sufficient that he said.

THE COURT: He stated things accurately?

THE DEFENDANT: Yes.

THE COURT: You're in agreement with what he said?

THE DEFENDANT: Yes, sir.

(Emphasis added.)

In my view, this colloquy put the court on notice that Pearl could not provide his client with meaningful legal representation. As a result, the colloquy triggered a duty on the court's part to intervene, either by determining that Stano wanted to waive his right to counsel and proceed pro se or by postponing the proceeding until Stano had meaningful representation. The court, however, did not intervene but instead accepted Stano's pleas.[1] In so doing, the court denied Stano the process he was due and thus violated his fundamental right to a fair proceeding. Accordingly, Stano's convictions should be set aside.

## II.

The sixth amendment to the United States Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The courts have long recognized that this right to counsel is fundamental to due process of law and is thus an essential component of a fair criminal prosecution. As Justice Sutherland wrote in *Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932):

The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel. Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. *He requires the guiding hand of counsel at every step in the proceedings against him.* Without it, though he be not guilty, he faces the danger of conviction, because he does not know how to establish his innocence. If that be true of men of intelligence, how much more is it true of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court

---

1. The majority implies that Stano's failure to move the court for leave to withdraw his guilty pleas prior to the imposition of sentence rendered the court's failure to intervene harmless. As my discussion makes clear, what transpired after Stano's plea hearing has no bearing on whether the court failed to discharge its duty to intervene *at the plea hearing.*

were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense.

*Id.* at 68–69, 53 S.Ct. at 64 (emphasis added). Following these principles, the Supreme Court in *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), held that the sixth amendment requires the government to provide counsel for a defendant in federal court unless he competently and intelligently waives his right to counsel. In *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), the Court held that the sixth amendment right to counsel is a fundamental right, essential to a fair trial and to due process of law, and that it therefore applies to the states through incorporation into the fourteenth amendment.[2] The right to assistance of counsel, moreover, attaches at all critical stages of the criminal justice system, and a plea hearing is such a stage.[3] *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

Thus, as the Court pronounced in *Johnson*—a pronouncement made applicable in *Gideon* to the state courts—"[t]he Sixth Amendment withholds from federal courts, in all criminal proceedings, the power and authority to deprive an accused of his life or liberty unless he has or waives the assistance of counsel." 304 U.S. at 463, 58 S.Ct. at 1022–23 (footnote omitted). The Court explained the duties that this rule imposed on trial courts:

> The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused—whose life or liberty is at stake—is without counsel. This *protecting duty* imposes the serious and weighty responsibility upon the trial

judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.

*Id.* at 465, 58 S.Ct. at 1023 (emphasis added). If a court allows a defendant to proceed at a critical stage without the assistance of counsel and without a competent waiver of the right to counsel, the court fails to discharge its "protecting duty" and allows a violation of the defendant's sixth amendment right to assistance of counsel. *See Gideon,* 372 U.S. at 344–45, 83 S.Ct. at 796–97 (no counsel at trial); *Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 2012, 32 L.Ed.2d 530 (1972) (no counsel at trial for misdemeanor); *White v. Maryland,* 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963) (no counsel at arraignment); *Hamilton v. Alabama,* 368 U.S. 52, 54–55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961) (same).

The Supreme Court has explained that, in such circumstances, the reviewing court must reverse the conviction without "stop[ping] to determine whether prejudice resulted." *White,* 373 U.S. at 60, 83 S.Ct. at 1051. As the Supreme Court observed in *United States v. Cronic,* "[t]he Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." 466 U.S. 648, 659 n. 25, 104 S.Ct. 2039, 2047 n. 25, 80 L.Ed.2d 657 (1984) (citing *Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975); *Brooks v. Tennessee,* 406 U.S. 605,

---

**2.** I refer throughout this opinion to the right to assistance of counsel as guaranteed explicitly in the sixth amendment and by implication in the fourteenth amendment.

**3.** Indeed, the majority explicitly recognizes the importance of the right to counsel in the context of a guilty plea. The majority states that counsel is "especially important" to a defendant who

pleads guilty, and quotes the Supreme Court's statement that, for a guilty plea, " '[c]ounsel is needed so that the accused may know precisely what he is doing, so that he is fully aware of the prospect of going to jail or prison, and so that he is treated fairly by the prosecution.' " *Ante* at 1140 (quoting *Argersinger v. Hamlin,* 407 U.S. 25, 34, 92 S.Ct. 2006, 2011, 32 L.Ed.2d 530 (1972)).

612–13, 92 S.Ct. 1891, 1895, 32 L.Ed.2d 358 (1972); *Hamilton v. Alabama*, 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961); *White v. Maryland*, 373 U.S. 59, 60, 83 S.Ct. 1050, 1051, 10 L.Ed.2d 193 (1963) (per curiam); *Ferguson v. Georgia*, 365 U.S. 570, 81 S.Ct. 756, 5 L.Ed.2d 783 (1961); *Williams v. Kaiser*, 323 U.S. 471, 475–76, 65 S.Ct. 363, 366, 89 L.Ed. 398 (1945)); *see also Perry v. Leeke*, 488 U.S. 272, 278, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989); *Penson v. Ohio*, 488 U.S. 75, 86–89, 109 S.Ct. 346, 353–54, 102 L.Ed.2d 300 (1988); *Holloway v. Arkansas*, 435 U.S. 475, 488, 98 S.Ct. 1173, 1181, 55 L.Ed.2d 426 (1978); *cf. Satterwhite v. Texas*, 486 U.S. 249, 256, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988). I discuss this presumption of prejudice in detail below.

The right to assistance of counsel, moreover, is "the right to the *effective* assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970); *see Kimmelman v. Morrison*, 477 U.S. 365, 377–78, 106 S.Ct. 2574, 2584, 91 L.Ed.2d 305 (1986). Assistance of counsel thus requires more than just the mere presence of an attorney. As the Court stated in *Holloway*, "[t]he mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters." 435 U.S. at 490, 98 S.Ct. at 1181. In *Cronic*, the Court explained that "[i]f no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." 466 U.S. at 654, 104 S.Ct. at 2044. At any critical stage, therefore, where it is apparent to the court that assistance of counsel is being actually or constructively denied, the court has a duty under the sixth amendment not to allow the defendant to proceed absent a valid waiver of his right to assistance of counsel. If the court does allow a defendant to proceed under such circumstances, without first obtaining a valid waiver, then prejudice must be presumed and the defendant's conviction must be set aside.

Before turning to the case at hand, I pause to consider the notion that a trial court has a duty to intervene in some circumstances to protect a defendant's constitutional rights. I then address the related notion that, if a trial court fails to discharge this duty, a reviewing court must presume that the defendant was prejudiced and set aside his conviction. After demonstrating that these notions are deeply rooted in a wide body of established precedent, and supported by the practical realities and limitations of collateral proceedings, I turn to a discussion of their application to the present case. I first explore the notion of trial judge error.

### A. *A Court's Duty to Intervene.*

When a trial judge receives notice of a circumstance or event implicating the fairness of a proceeding before the court, he assumes a responsibility to intervene in order to preserve the proceeding's fairness. If the trial judge fails to discharge this duty, then he becomes causally responsible for the error and its effects.

As a panel of this court explained in *Willis v. Kemp*, 838 F.2d 1510, 1519–20 (11th Cir.1988), *cert. denied*, 489 U.S. 1059, 109 S.Ct. 1328, 103 L.Ed.2d 596 (1989), three categories of error exist: error caused by the trial court, error caused by an effective attorney's reasonable tactical choices, and error caused by an attorney's incompetence. In discussing a prosecutorial misconduct claim, the court stated:

> When a habeas petitioner contends that a state prosecutor's misconduct before the jury rendered his trial fundamentally unfair, he means that one of three scenarios took place. In the first scenario, petitioner's attorney afforded the petitioner effective assistance of counsel, as required by the sixth and fourteenth amendments to the Constitution. When the prejudicial misconduct occurred, the attorney made a timely objection, asked the court for relief—either a curative instruction or a mistrial—and the court denied his request. In this scenario, the trial court, rather than the prosecutor, caused the unfair trial, although the prejudice would not have occurred but for the prosecutor's misconduct. The petitioner's claim is, then, that

the court denied him due process of law....

In the second scenario, petitioner's attorney provided effective assistance of counsel, but did not object to the prosecutor's misconduct, reasonably concluding that he could eliminate the prejudice as the trial progressed and that it was to his client's advantage not to object. Defense counsel's strategy failed, however, and the prejudice remained. In this scenario, the petitioner's attorney, rather than the prosecutor or the court, caused the unfair trial. The petitioner has no constitutional claim in this situation: he received effective assistance of counsel and the court did not deny him a fair trial.

In the third scenario, the petitioner's attorney provided ineffective assistance of counsel and took no steps to eliminate the prejudice caused by the prosecutor's misconduct. In this scenario, petitioner's counsel, through his incompetence, caused the unfairness. The petitioner's claim is not that he was denied due process, but that he was denied effective assistance of counsel in violation of the sixth and fourteenth amendments.

*Id.* (citations omitted; footnotes omitted).

The *Willis* court thus explained the kinds of errors that violate federal constitutional rights. Under the third scenario, if an attorney's representation falls below acceptable levels of competence, that error implicates the defendant's sixth amendment right to the effective assistance of counsel. Under *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984), the court, on collateral review, will grant relief if counsel's performance was deficient and if the deficiency prejudiced the defendant.

Under the first *Willis* scenario, an occurrence during the course of a proceeding puts the trial court on notice of an error and triggers its duty to intervene. This duty to intervene is triggered in two general ways: either an attorney's objection puts the court on notice of a potential for error; or circumstances themselves put the court on notice, thus triggering a duty on its part to intervene *sua sponte.* I consider these two possibilities in turn.

In a case involving prosecutorial misconduct, an objection by the defendant's attorney puts the trial court on notice of the misconduct and triggers its duty to intervene. If prosecutorial misconduct has occurred, causing prejudice to the defendant, and the trial judge fails to intervene by issuing a curative instruction or by granting a mistrial, then the court assumes responsibility for the error and a violation of the defendant's right to a fair trial under the due process clause occurs.

As courts have recognized, an attorney's objection triggers a similar duty to intervene on the trial court's part in a variety of situations. In *Fludd v. Dykes,* 863 F.2d 822 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 201, 107 L.Ed.2d 154 (1989), for example, a panel of this court held that *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), applied to civil as well as criminal cases, recognizing the trial court's responsibility in preventing the use of peremptory challenges for discriminatory purposes. The court analyzed the role of the trial court when a party objects to a venire's racial composition and concluded that "[i]n overruling the objection, which informed the court that the peremptory challenger may be excluding blacks from the venire on account of their race, the judge becomes guilty of the sort of discriminatory conduct that the equal protection clause proscribes." *Id.* at 828. The attorney's objection thus puts the court on notice that the other side may be improperly exercising its peremptory challenges and triggers a duty on the court's part to intervene. Assuming the objecting party establishes a prima facie case of purposeful discrimination under *Batson, see id.* at 829, the court must intervene and require the opponent to come forward with a neutral justification for the challenges. If the objecting party makes out a prima facie case but the trial court refuses to require the opposing party to come forward with a justification, or accepts an inadequate justification, for the challenges, then the trial court assumes responsibility for the consti-

tutional error as the discriminatory actor under the equal protection clause.

The trial court assumes a similar responsibility, in a sentencing proceeding of a capital case, when a defendant's attorney raises an objection that a prosecutor's comment to a jury violates the eighth amendment under *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). As this court, sitting en banc, explained at length in *Mann v. Dugger,* 844 F.2d 1446 (11th Cir.1988) (en banc), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989), a court conducts a two-part analysis of a *Caldwell* claim. First, the court determines whether the prosecutor's comments would "'minimize the jury's sense of responsibility for determining the appropriateness of death.'" *Id.* at 1456 (quoting *Caldwell,* 472 U.S. at 341, 105 S.Ct. at 2646). Second, the court determines "'whether the trial judge in this case sufficiently corrected the impression left by the prosecutor.'" *Id.* (quoting *McCorquodale v. Kemp,* 829 F.2d 1035, 1037 (11th Cir.), *cert. denied,* 483 U.S. 1055, 108 S.Ct. 32, 97 L.Ed.2d 819 (1987)). The en banc court then explained the rationale behind this test:

> When a trial court does not correct misleading comments as to the jury's sentencing role, the state has violated the defendant's eighth amendment rights because the court has given the state's imprimatur to those comments; the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law.... [O]ur focus is ultimately on the trial court's actions....

*Id.* at 1457 (citation omitted); *see Harich v. Dugger,* 844 F.2d 1464, 1478 (11th Cir.1988) (en banc) (Tjoflat, J., specially concurring, joined by Kravitch, Hatchett, Anderson, & Clark, JJ.) ("*Caldwell* error occurs if the trial court implicitly puts its imprimatur on

the prosecutor's statements."), *cert. denied,* 489 U.S. 1071, 109 S.Ct. 1355, 103 L.Ed.2d 822 (1989). The defendant's objection thus puts the court on notice of the potential *Caldwell* violation and triggers a duty on the court's part to correct the prosecutor's comment if it is misleading.[4] The prosecutor's comment, like the prosecutor's misconduct in *Willis,* initially causes the error. The trial court, however, following an objection by the defendant's attorney, has a duty to intervene and correct the error. If the trial court fails to discharge that duty, then it bears causal responsibility for the constitutional error.

Likewise, the trial court has a duty to intervene when counsel representing multiple defendants informs the court of a conflict of interest. *See Holloway v. Arkansas,* 435 U.S. 475, 484, 98 S.Ct. 1173, 1178, 55 L.Ed.2d 426 (1978); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The Court in *Cuyler v. Sullivan* emphasized that an attorney has an "ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." 446 U.S. 335, 346, 100 S.Ct. 1708, 1717, 64 L.Ed.2d 333 (1980). Once the attorney fulfills that obligation, though, the court has a duty to intervene. As the Court explained in *Holloway,* "'[u]pon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused.'" 435 U.S. at 484, 98 S.Ct. at 1179 (quoting *Glasser,* 315 U.S. at 71, 62 S.Ct. at 465). In the Court's view, the attorney's statement that he had a conflict of interest—a statement made pursuant to the attorney's obligations as an officer of the court—triggered the judge's duty to intervene. Under those circumstances, the judge's failure "either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel ... deprived peti-

---

**4.** In fact, the judge may have a duty to intervene *sua sponte* in such a case even if the defense attorney fails to raise an objection. Accordingly, the judge's failure to intervene would constitute *Caldwell* error. Under the contemporaneous objection rules in some jurisdictions, however, the absence of an objection might create a

procedural default that could prevent a federal habeas court from entertaining the defendant's *Caldwell* claim. *See Cooper v. Wainwright,* 807 F.2d 881, 886–87 (11th Cir.1986), *cert. denied,* 481 U.S. 1050, 107 S.Ct. 2183, 95 L.Ed.2d 839 (1987).

tioners of the guarantee of 'assistance of counsel.'" *Id.*, 98 S.Ct. at 1178–79. The court's duty of inquiry in such a case must, however, be triggered by a timely objection: the trial court has no duty itself "to initiate inquiries into the propriety of multiple representation in every case." *Cuyler*, 446 U.S. at 346, 100 S.Ct. at 1717.[5]

The circumstances surrounding a proceeding may, however, trigger a duty on the trial court's part to intervene *sua sponte*, independently of an attorney's objection. For example, it is well established that, "[w]hen a court has a 'bona fide doubt' as to the defendant's competence, it must *sua sponte* conduct a hearing on his competence to stand trial." *Hance v. Zant*, 696 F.2d 940, 948 (11th Cir.) (citing *Pate v. Robinson*, 383 U.S. 375, 385, 387, 86 S.Ct. 836, 842, 843, 15 L.Ed.2d 815 (1966)), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983), *overruled on other grounds, Brooks v. Kemp*, 762 F.2d 1383 (11th Cir.) (en banc), *cert. denied*, 483 U.S. 1010, 107 S.Ct. 3240, 97 L.Ed.2d 744 (1987); *see also Tiller v. Esposito*, 911 F.2d 575, 576 (11th Cir.1990). The *Pate* case thus imposes an obligation on the trial court "to protect a defendant's right not to be tried or convicted while incompetent to stand trial." *Fallada v. Dugger*, 819 F.2d 1564, 1568 (11th Cir.1987). The trial court's failure to discharge this responsibility "deprives [the defendant] of his due process right to a fair trial." *Id.* This duty on the court's part, as a panel of this court explained in *Demos v. Johnson*, 835 F.2d 840 (11th Cir.), *cert. denied*, 486 U.S. 1023, 108 S.Ct.1998, 100 L.Ed.2d 229 (1988), is triggered

whenever the court learns of facts or events which raise a reasonable ground to doubt defendant's competency.... Such information "need not be presented in a formal motion nor argued by defense counsel nor be presented to the judge in form of admissible evidence." *Lokos v. Capps*, 625 F.2d 1258, 1260 (5th Cir.1980). The issue is whether, in light of what was known to the trial court, "the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial." *Drope [v. Missouri]*, 420 U.S. [162,] 174–75, 95 S.Ct. [896,] 905 [, 43 L.Ed.2d 103 (1975)].

*Id.* at 843 (citation omitted; footnote omitted); *see Bowden v. Francis*, 733 F.2d 740, 747 (11th Cir.1984) ("in determining whether a trial court has denied a defendant due process by refusing to obtain a psychiatric evaluation, we must 'focus on what the trial court did in light of what it then knew' "), *vacated*, 470 U.S. 1079, 105 S.Ct. 1834, 85 L.Ed.2d 135 (remanded for reconsideration in light of *Ake v. Oklahoma*, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985)), *aff'd on remand*, 767 F.2d 761 (1985), *cert. denied*, 476 U.S. 1164, 106 S.Ct. 2291, 90 L.Ed.2d 732 (1986).

Trial courts have a similar duty in the guilty plea context to ensure that a defendant's plea is made knowingly, intelligently, and voluntarily. As the Supreme Court held in *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969), the due process clause of the fourteenth amendment allows a state court to accept a guilty plea only if it is entered knowingly, voluntarily, and intelligently.[6]

---

**5.** Note, however, that Rule 44(c) of the Federal Rules of Criminal Procedure mandates that the trial court, when faced with multiple defendants who are either jointly charged or tried and are represented by the same counsel, "shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel ... the court shall take such measures as may be appropriate to protect each defendant's right to counsel." Thus, the trial court's "protecting duty" is codified in some conflict of interest situations.

**6.** The Standards for Criminal Justice provide:

(a) The court should not accept a plea of guilty or nolo contendere from a defendant without first addressing the defendant personally in open court and determining that the defendant understands:

(i) the nature and elements of the offense to which the plea is offered;

(ii) the maximum possible sentence on the charge, including that possible from consecutive sentences, and the mandatory minimum sentence, if any, on the charge, or of any special circumstances affecting probation or release from incarceration;

(iii) that, if the defendant has been previously convicted of an offense and the offense to which the defendant has offered to

Thus, independent of the requirements for effective representation by a lawyer, the judge has a duty to ensure that the defendant's plea satisfies the mandate of due process and to intervene *sua sponte* by not accepting the plea if it does not satisfy that mandate. The court's duty, under the due process clause, is triggered the moment the defendant stands to tender his plea. In order to ensure that due process has been accorded, the court must establish on the record "the prerequisites of a valid waiver." *Id.*, 89 S.Ct. at 1712. If the record fails to demonstrate those prerequisites, then the reviewing court must presume prejudice and set aside the conviction.

As I discuss above, the right to assistance of counsel imposes a duty on the trial court to intervene in certain circumstances. The court has a "protecting duty," to use the *Johnson* Court's term, with respect to

plead is one for which a different or additional punishment is authorized by reason of the previous conviction or other factors, the fact of the previous conviction or other factors may be established after the plea, thereby subjecting the defendant to such different or additional punishment;
(iv) that by pleading guilty the defendant waives the right to a speedy and public trial, including the right to trial by jury; the right to insist at a trial that the prosecution establish guilt beyond a reasonable doubt; the right to testify at a trial and the right not to testify at a trial; the right at a trial to be confronted by the witnesses against the defendant, to present witnesses in the defendant's behalf, and to have compulsory process in securing their attendance; and
(v) that by pleading guilty the defendant waives the right to object to the sufficiency of the charging papers to state an offense and to evidence allegedly obtained in violation of constitutional rights, except to the extent that motions concerning such matters may already have been made and ruled upon, or unless the right of appeal on such issues is reserved.
(b) If the court is in doubt about whether the defendant comprehends his or her rights and the other matters of which notice is required to be supplied in accordance with this standard, the defendant should be asked to repeat to the court in his or her own words the information about such rights and the other matters, or the court should take such other steps as may be necessary to assure itself that the guilty plea is entered with complete understanding of the consequences.
(c) *If the defendant is represented by a lawyer, the court should not accept the plea where it appears the defendant has not had the effective assistance of counsel.*
Standards for Criminal Justice § 14–1.4 (1982) (emphasis added).
The federal courts have a similar obligation not to accept involuntary pleas pursuant to Fed. R.Crim.P. 11, which provides in pertinent part:
(c) *Advice to Defendant.* Before accepting a plea of guilty or nolo contendere, the court must address the defendant personally in open court and inform the defendant of, and determine that the defendant understands, the following:
(1) the nature of the charge to which the plea is offered, the mandatory minimum penalty provided by law, if any, and the maximum penalty provided by law, including the effect of any special parole or supervised release term, the fact that the court is required to consider any applicable sentencing guidelines but may depart from those guidelines under some circumstances, and, when applicable, that the court may also order the defendant to make restitution to any victim of the offense; and
(2) if the defendant is not represented by an attorney, that the defendant has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will by appointed to represent the defendant; and
(3) that the defendant has the right to plead not guilty or to persist in that plea if it has already been made, the right to be tried by a jury and at that trial the right to the assistance of counsel, the right to confront and cross-examine adverse witnesses, and the right against compelled self-incrimination; and
(4) that if a plea of guilty or nolo contendere is accepted by the court there will not be a further trial of any kind, so that by pleading guilty or nolo contendere the defendant waives the right to a trial; and
(5) if the court intends to question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant has pleaded, that the defendant's answers may later by used against the defendant in a prosecution for perjury or false statement.
(d) *Insuring That the Plea is Voluntary.* The court shall not accept a plea of guilty or nolo contendere without first, by addressing the defendant personally in open court, determining that the plea is voluntary and not the result of force or threats or of promises apart from a plea agreement. The court shall also inquire as to whether the defendant's willingness to plead guilty or nolo contendere results from prior discussions between the attorney for the government and the defendant or the defendant's attorney.

the "constitutional right of an accused to be represented by counsel." 304 U.S. at 465, 58 S.Ct. at 1023. Pursuant to this duty, if the accused appears at a critical stage of the criminal process without an attorney, the court has "the serious and weighty responsibility ... of determining whether there is an intelligent and competent waiver by the accused." *Id.*, 58 S.Ct. at 1023. If the defendant does not waive his right to counsel, then the court can discharge its "protecting duty" only by postponing the proceeding until the defendant has assistance of counsel. Thus, when the court is put on notice that the defendant lacks assistance of counsel, the court assumes a responsibility to intervene by either continuing the proceeding or ensuring that the defendant has intelligently and competently waived his right to counsel.

As cases like *Cronic* and *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932), demonstrate, moreover, the court's "protecting duty" extends beyond the situation where a defendant appears without counsel. Less obvious deprivations of the defendant's right to counsel also trigger the court's duty to intervene. As I discuss above, the right to assistance of counsel guarantees the defendant more than the "mere physical presence of an attorney," *Holloway,* 435 U.S. at 490, 98 S.Ct. at 1181; it guarantees the defendant "*effective* assistance of counsel," *McMann,* 397 U.S. at 771 n. 14, 90 S.Ct. at 1449 n. 14. Accordingly, just as the court has a duty to intervene when the defendant appears without counsel, the court also has a duty to intervene when it becomes apparent to the court from the circumstances that the defendant is without counsel who can actually assist him. "If no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." *Cronic,* 466 U.S. at 654, 104 S.Ct. at 2044.

Of course, when a defendant who has invoked his right to counsel appears in court without a lawyer, the court is automatically put on notice that the defendant lacks meaningful representation. In contrast, when the defendant appears in court along with a lawyer, but a lawyer who is unable to provide even the most basic assistance, the surrounding circumstances may put the court on notice that the defendant in effect lacks assistance of counsel. Several kinds of events can provide such notice to the court. For example, as in the *Holloway* case, the lawyer himself can inform the court of his inability to represent his client. Or, as in *Powell* (which I address in detail below), the circumstances surrounding the proceeding can themselves be so extreme as to give the judge notice that any lawyer, even a fully competent one, would be unable to provide "the aid of counsel in any real sense." *See Powell,* 287 U.S. at 57, 53 S.Ct. at 60; *Cronic,* 466 U.S. at 659–60, 104 S.Ct. at 2047. The present case, as I discuss below, falls into the *Holloway* category: the petitioner's lawyer himself expressly informed the court of his inability to provide meaningful representation, thus triggering the court's "protecting duty" to intervene.

Once the court's "protecting duty" is triggered, the court must satisfy its responsibility in one of two ways: either it must postpone the proceeding until the defendant receives meaningful representation, or it must ensure that the defendant wants to proceed pro se and intelligently and knowingly waives his right to assistance of counsel. As the Court held in *Faretta v. California,* "a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so." 422 U.S. 806, 807, 95 S.Ct. 2525, 2527, 45 L.Ed.2d 562 (1975); *see id.* at 835, 95 S.Ct. at 2541 (citing *Johnson* ). The court, however, must still discharge its "protecting duty" by ensuring that the defendant "voluntarily and intelligently elects to do so." In addressing this responsibility on the court's part, the *Faretta* Court held:

Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows

what he is doing and his choice is made with eyes open."

*Id.* at 835, 95 S.Ct. at 2541.

The lower courts have further developed the *Faretta* Court's holding on this point. This court has established a two-part requirement for ensuring that the defendant has "knowingly and intelligently" waived his right to assistance of counsel and has chosen self-representation. As this court has stated, "[b]efore a court permits a defendant to represent himself ..., the defendant must clearly and unequivocally assert the right of self-representation." *Fitzpatrick v. Wainwright,* 800 F.2d 1057, 1064 (11th Cir.1986) (citing *Raulerson v. Wainwright,* 732 F.2d 803, 808 (11th Cir.), *cert. denied,* 469 U.S. 966, 105 S.Ct. 366, 83 L.Ed.2d 302 (1984)); *see Dorman v. Wainwright,* 798 F.2d 1358, 1366 (11th Cir.1986) (discussing actions required for assertion of right to self-representation), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987). The court must elicit this unequivocal assertion in order to safeguard the defendant's right to counsel.

In addition to this "clear and unequivocal assertion of the right of self-representation," this court has held that "other safeguards are required": "a trial judge should normally conduct a waiver hearing to insure that the defendant understands the disadvantages of self-representation, including, *inter alia,* the defendant's understanding of the risks and complexities of his particular case." *Fitzpatrick,* 800 F.2d at 1065; *see Dorman,* 798 F.2d at 1366. In some rare cases, "depend[ing] on the particular facts and circumstances ..., including the background, experience, and conduct of the accused," a valid waiver can be shown absent such a hearing. *Fitzpatrick,* 800 F.2d at 1065, 1068.

Under this body of caselaw, therefore, if the defendant proceeds at a critical stage without the assistance of counsel—either in fact or constructively—and the trial court, being aware of this fact, has not, pursuant to *Faretta,* determined on the record that the defendant has knowingly and intelligently waived his right to counsel and asserted his right to self-representation,[7] then the defendant's conviction cannot stand. In such a case, moreover, the reviewing court must presume prejudice as a matter of law, and set aside the conviction once the defendant establishes a prima facie case. I discuss this prejudice requirement next.

### B. *The Presumption of Prejudice.*

Before addressing the conclusive presumption of prejudice in cases where the trial judge has failed to discharge his "protecting duty" under *Johnson* and *Gideon,* I discuss more generally how a court conducts a collateral review of a claim of trial court error at a critical stage of a criminal prosecution.

The general principle behind these judge error cases is that due process requires a judge to ensure the fairness of the proceeding before him. Judge error thus occurs when the trial judge receives notice of a

---

**7.** According to the majority, the trial court is not obliged to make such a determination where the defendant, having obtained a lawyer, tenders a plea of guilty without his attorney's presence—either in fact or constructively. In other words, *Faretta* and its progeny do not apply in the guilty plea context. The majority reaches this conclusion by observing that "the *Faretta* inquiry is reserved for advising a defendant of the disadvantages of proceeding pro se at trial." *Ante* at 1149. According to the majority, the *Faretta* inquiry "is tailored to elicit whether the defendant is capable of conducting his own defense.... By definition, a defendant who pleads guilty relinquishes his defense." *Ante* at 1149. Alternatively, assuming *Faretta's* applicability in the guilty plea context, the trial court's duty to determine whether the defendant intends to waive counsel and proceed pro se is not triggered unless the defendant "'clearly and unequivocally assert[s] the desire to represent himself.'" *Ante* at 1144 (quoting *Cross v. United States,* 893 F.2d 1287, 1290 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 138, 112 L.Ed.2d 105 (1990)). In this case, the majority finds no such clear and unequivocal assertion by the petitioner; therefore, the trial court had no duty to intervene.

To me, the majority's position is absurd. Suppose Stano's lawyer, Mr. Pearl, had failed to show up for the plea hearing. In that event, Stano would quite literally not have had a lawyer. Would the majority hold that the trial judge had no duty to inquire whether Stano wished to waive his right to counsel and proceed pro se? I think not.

circumstance or event that threatens the proceeding's fairness but fails to take corrective action, allowing (or forcing) the proceeding to continue despite the threat. As I discuss above, the judge's duty to intervene can be triggered in different ways: in some cases, the circumstances themselves trigger the judge's duty to intervene *sua sponte;* in other cases, an attorney's announcement to the court, often an objection, triggers the duty. By not intervening under such circumstances, the judge fails to ensure that the defendant is accorded a procedure that he is due and thereby creates the possibility of undue prejudice to the defendant.

A common procedural model characterizes all of these trial judge error claims. Under this model, a defendant establishes a prima facie case of constitutional error by pointing to the transcript of the trial court proceeding.[8] Because trial court error derives from the judge's failure to intervene given the circumstances of the proceeding before him, the error necessarily appears on the trial court transcript. Accordingly, the reviewing court decides whether or not the trial judge committed error (and thus whether or not the defendant makes out a prima facie case) by looking "not to evidence disclosed and developed in later state or federal collateral proceedings—evidence for which the trial judge cannot conceivably be held accountable—but to the record that was before the trial judge at the time of the challenged action." *Smith v. Zant,* 887 F.2d 1407, 1414 (11th Cir.1989) (en banc) (Tjoflat, J., specially concurring). The reviewing court, in effect, looks over the shoulder of the trial judge and evaluates the judge's actions in light of the circumstances before him at the time. *See, e.g., Smith v. Kelso,* 863 F.2d 1564, 1574 (11th Cir.) (Tjoflat, J., specially concurring) (reviewing court evaluates whether trial judge committed constitutional error in denying motion for severance based on circumstances before judge at time, and not from perspective of "Monday morning quarterback"), *cert. denied,* 490 U.S. 1072, 109 S.Ct. 2079, 104 L.Ed.2d 644 (1989); *Moore v. Kemp,* 809 F.2d 702, 710 (11th Cir.1987) (en banc) (assessing reasonableness of trial judge's action in denying defendant's request for expert witness as of "the time [the trial judge] took it"); *Stephens v. Kemp,* 846 F.2d 642, 646–47 (11th Cir.) (following *Moore* ), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988); *Bowden,* 733 F.2d at 747 ("in determining whether a trial court has denied a defendant due process by refusing to obtain a psychiatric evaluation, we must 'focus *on what the trial court did in light of what it then knew'* " (emphasis added) (quoting *Hance,* 696 F.2d at 948)).

The defendant thus makes out a prima facie case by showing, based on the trial court transcript, that the trial judge failed to discharge his protecting duty given the circumstances before him. That showing raises a presumption of prejudice. That is, the trial court transcript itself yields a presumption of prejudice.[9] Depending upon

---

**8.** I refer throughout the opinion to both the trial court record and the trial court transcript. The trial court record, of course, includes the transcript, if any, of the proceeding. When referring to the trial court transcript, I include, in addition to the transcript of the proceeding, any exhibits that may have been introduced into evidence at the proceeding.

**9.** The defendant faces a different burden of proof in an *attorney error* case, where, for example, the defendant claims that his attorney failed to develop an alibi defense or that his attorney, in a death penalty case, failed to develop mitigating evidence. In that kind of case, the defendant must show, under *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064, that the attorney's representation was deficient and also that the deficiency prejudiced the defendant. In the *Strickland* type of case, unlike in a trial judge error case, the trial transcript is invariably silent concerning the deficiency of the attorney's performance. The transcript itself, therefore, rarely yields a presumption of prejudice. Rather, the defendant bears the burden of presenting the error, which occurred off the record, in a petition for collateral review.

In a judge error case, such as the one before us, the attorney's inability to provide representation in any real sense is apparent from the record of the trial court proceeding. The court, under those circumstances, has notice of the attorney's inability, and the court's protecting duty is thus triggered. Accordingly, if the court fails to discharge its protecting duty, the constitutional error, which is apparent on the face of the trial court transcript, is ascribable to the

the nature of the error at issue, the prosecution may or may not be able to rebut the presumption of prejudice.

Three categories of trial judge error exist. In the first category, the nature of the error is such that the prosecution, in a collateral proceeding, may be able to present extrinsic evidence—which was not presented to the trial judge—in order to rebut the presumption of prejudice raised by the defendant's prima facie case. In the second category, the nature of the error is such that the prosecution is precluded by existing caselaw from rebutting the presumption of prejudice *with extrinsic evidence*, but it may be able to show, based solely on the record of the criminal proceeding, that the error was harmless. In the third category of error, a per se rule of prejudice applies, and the prosecution is *entirely* precluded from rebutting the defendant's prima facie case: policy concerns and the practical limitations of determining prejudice in these cases justify a per se

rule without regard to whether the error actually prejudiced the defendant. I consider these three categories of error in turn.

1.

I discuss the first category of trial judge error, where the prosecution may rebut the prejudice inherent in the error with extrinsic evidence in a collateral proceeding, by examining how a defendant brings a claim of constitutional error under *Boykin v. Alabama*, 395 U.S. 238, 242, 89 S.Ct. 1709, 1711, 23 L.Ed.2d 274 (1969). In *Boykin*, the Supreme Court held that the due process clause of the fourteenth amendment allows a state court to accept a guilty plea only if it is entered knowingly, voluntarily, and intelligently. Generally, when a defendant's conviction is based on a plea of guilty, he cannot attack his conviction on direct appeal: he has admitted his guilt, waived several constitutional rights, and been sentenced accordingly.[10] Most *Boy-*

court. In that situation, the trial court record itself yields a presumption of prejudice.

10. *Boykin* itself, however, involved a direct appeal from the defendant's conviction. The defendant pled guilty to a murder charge before a state trial judge, and the judge sentenced him to death. An Alabama statute provided for an automatic direct appeal of a capital case to the state supreme court and required the supreme court to search the record for plain error. On direct appeal, the state supreme court upheld the sentence, but several justices dissented on the ground that the record of the plea hearing failed to show that the defendant had intelligently and knowingly pleaded guilty. In their view, the trial judge committed constitutional error in accepting the guilty plea without an affirmative showing, on the record, that the plea was voluntarily and knowingly entered. The United States Supreme Court granted certiorari to address that issue and, agreeing with the dissenting Alabama justices, reversed the state supreme court's decision. The Court concluded that a defendant's plea of guilty cannot stand if "the record does not disclose that the defendant voluntarily and understandingly entered his plea[ ] of guilty." *Boykin*, 395 U.S. at 244, 89 S.Ct. at 1713 (quoting state supreme court dissent).

In his dissent in *Boykin*, Justice Harlan characterized the Court's decision as follows: "The Court thus in effect fastens upon the States, as a matter of federal constitutional law, the rigid prophylactic requirements of Rule 11 of the Federal Rules of Criminal Procedure." *Id.* at 245, 89 S.Ct. at 1713. Justice Harlan character-

ized the rule applied in *Boykin* as a prophylactic: under that rule, once the Court concluded that the record failed to disclose that the plea was voluntary, it conclusively presumed prejudice and vacated the conviction; the Court gave the state no opportunity to rebut the defendant's case by showing that the plea was in fact made knowingly, intelligently, and voluntarily. As Justice Harlan observed, "[t]he Court's reversal is therefore predicated entirely upon the failure of the arraigning state judge to make an 'adequate' record." *Id.* at 247, 89 S.Ct. at 1714.

Most *Boykin* claims now come to federal court in the context of a habeas proceeding. In that context, the federal courts are not limited to the record of the plea hearing. The district court can augment that record by conducting an evidentiary hearing. The lower federal courts have therefore interpreted the *Boykin* holding differently than Justice Harlan interpreted it. As the Sixth Circuit explained in *Roddy v. Black*, 516 F.2d 1380, 1383–84 (6th Cir.), *cert. denied*, 423 U.S. 917, 96 S.Ct. 226, 46 L.Ed.2d 147 (1975):

*Boykin* requires that no guilty plea be accepted "without an affirmative showing that it was intelligent and voluntary." *Boykin* mandates that a conviction based on a guilty plea be reversed unless "the prosecution spread[s] on the record the prerequisites of a valid waiver" of the constitutional rights which a defendant surrenders by pleading guilty.

It is good procedure, therefore, for a state judge to conduct a careful inquiry into the defendant's understanding of the nature and

*kin* claims, therefore, come to federal court in the context of a habeas proceeding.

According to the lower courts' interpretation of *Boykin* in the habeas context, *see, e.g., Roddy v. Black,* 516 F.2d 1380 (6th Cir.), *cert. denied,* 423 U.S. 917, 96 S.Ct. 226, 46 L.Ed.2d 147 (1975); *McChesney v. Henderson,* 482 F.2d 1101 (5th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974),[11] the defendant establishes a prima facie case under *Boykin* if the record of the plea hearing fails to demonstrate a valid waiver of the defendant's constitutional rights. Once the defendant establishes a prima facie case, a presumption of prejudice arises under *Boykin.* The state may be able to rebut this presumption by showing that the plea was in fact knowingly and intelligently entered. Assuming the defendant establishes his prima facie case under *Boykin,* the state must then show that, despite the record's failure to demonstrate a valid waiver of constitutional rights, the defendant suffered no prejudice—i.e., he in fact possessed the knowledge and understanding necessary for a valid waiver. The state may be able to satisfy this burden by pointing to some other evidence—aside from the record of the plea hearing itself—that the defendant understood what he was doing when he

pled. The state could satisfy this requirement by proving, for example, that the defendant had a law degree, had practiced criminal law for a number of years, was familiar with the facts of his own case, and had extensively researched the applicable law.

The state could similarly rebut a defendant's claim that the trial court violated the rule in *Faretta* by allowing the defendant to proceed pro se without holding a waiver hearing.[12] *Faretta,* like *Boykin,* concerns whether the defendant possesses the understanding necessary for a valid waiver of constitutional rights. As a matter of law, the court satisfies the mandate of *Faretta* by holding a waiver hearing. If the court fails to hold such a hearing, however, the state could still show that the defendant possessed the necessary understanding for a valid waiver. For example, as this court explained in *Fitzpatrick,* 800 F.2d at 1065, the state could point to "the background, experience, and conduct of the accused" in order to demonstrate that the defendant understood the disadvantages of self-representation. If the evidence showed that the defendant did in fact possess such an understanding, then the defendant's *Faretta* claim would fail.

consequences of his plea. A comprehensive on-the-record inquiry into this matter "forestalls the spin-off of collateral proceedings that seek to probe murky memories."

If the discussion between defendant and trial judge at the time of a plea's acceptance leaves doubt as to whether a plea was in fact voluntary and intelligent, however, a defendant is not automatically entitled to a reversal of his conviction. Rather, in that circumstance if a defendant argues in a post-conviction proceeding that his plea was entered without his consent or without an understanding of the plea's nature and consequences, *Boykin* places a burden on the State to prove the contrary. A habeas court may not "presume a waiver of [a defendant's] federal rights from a silent record." The State must prove that the defendant's guilty plea was voluntary and intelligent, and to do so it may introduce evidence extrinsic to the transcript of the plea's acceptance.

In the face of an inadequate transcript at the time of a guilty plea's acceptance, the State must make a clear and convincing showing that the plea was in fact knowingly and understandingly entered.

(Quoting *Boykin;* footnotes and citations omitted.) If the state makes this showing, it "obviate[s] the necessity of vacating the plea." *Id.* at 1384 n. 5 (quoting *Todd v. Lockhart,* 490 F.2d 626, 628 (8th Cir.1974)). Our own circuit has similarly interpreted the requirements under *Boykin* in post-conviction proceedings. *See McChesney v. Henderson,* 482 F.2d 1101, 1106 (5th Cir.1973), *cert. denied,* 414 U.S. 1146, 94 S.Ct. 901, 39 L.Ed.2d 102 (1974).

**11.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

**12.** This analysis, however, applies only to the second requirement under this court's interpretation of *Faretta*—that of a waiver hearing. The state may not rebut a claim that the trial court allowed the defendant to represent himself although the defendant never clearly and unequivocally invoked his right to proceed pro se under the first *Faretta* requirement. I discuss this issue in more detail below. *See infra* at pp. 1182–1183.

## 2.

In the second category, the nature of the error is such that the prosecution is precluded under the caselaw from presenting extrinsic evidence in a collateral proceeding to rebut the presumption of prejudice. Rather, the prosecution must persuade the reviewing court that, based on the record of the trial court proceeding, the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). That is, absent the error, the outcome of the proceeding would not have changed.

Assume, for example, that a defendant claims under *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), that the trial court gave a jury instruction that impermissibly shifted the burden of proof to the defendant on a fact necessary to establish an element of the charged offense. The defendant establishes a prima facie case of constitutional error by relying on the language of the instruction. If, as the Court explained in *Sandstrom,* a reasonable juror could have interpreted the instruction as shifting the burden of proof to the defendant, then the reviewing court cannot discount the possibility that one of the jurors actually did interpret it to do so and must presume that the instruction prejudiced the defendant. *See* 442 U.S. at 519, 99 S.Ct. at 2456–57. The only way the prosecution could rebut this presumption of prejudice with extrinsic evidence would be to have the court convene a post-conviction evidentiary hearing in which the prosecution could examine each of the jurors, under oath, regarding his or her interpretation of the instruction at issue. It requires little discussion to demonstrate the unreliability, if not the utter futility, of such a procedure. The passage of time since the trial would cloud the jurors' memories, and testimony in the context of a collateral evidentiary hearing would hardly be an accurate indication of the role the instruction may actually have played in the course of the jury's deliberations. The procedure, moreover, would inevitably require the collateral court and counsel to ride roughshod through the jury's entire deliberation process. If, for example, the jurors indicated that they had not interpreted the instruction as shifting the burden of proof to the defendant or that the proof of guilt was such that the instruction had no effect on their deliberations, then the court would have to allow the petitioner's attorney to conduct a thorough cross-examination of every juror in an attempt to demonstrate that the instruction had influenced the deliberation process as a whole. Not only would the testimony be inherently unreliable, but our system of justice clearly could not tolerate such an invasion of the sanctity of the deliberation process. In the *Sandstrom* situation, therefore, if the prosecution is to rebut the presumption of prejudice arising from an improper burden-shifting instruction, it must do so by showing that, based on the record of the trial proceeding alone, the defendant was not unduly prejudiced by the instruction.

As this court explained in *Collins v. Zant,* 892 F.2d 1502, 1507 (11th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 225, 112 L.Ed.2d 180 (1990), a jury instruction that violates *Sandstrom* can prove to be harmless either (1) because the defendant conceded the ultimate fact at issue, or (2) because the evidence regarding that fact was so overwhelming that the jury did not have to rely on the erroneous instruction in convicting the defendant. In *Collins,* the defendant was charged with murdering a woman with a tire jack. In his charge to the jury, the trial judge gave an erroneous instruction on the issue of the defendant's intent to cause the victim's death. The defendant, who was at the scene of the murder but who contended that another person did the killing, never disputed that whoever struck the victim intended her death; rather, he claimed that he was not the one who had struck the fatal blow. The reviewing court thus determined, based on the trial court record, that the error was harmless: the defendant had conceded the ultimate fact at issue. Although the trial court transcript showed that the error had in fact occurred, thus yielding a presumption of prejudice, the

record also demonstrated that the error was in effect harmless.

### 3.

In the third category, the nature of the trial judge error is such that a per se rule of prejudice applies: the prosecution is entirely precluded by law from rebutting the defendant's prima facie case of constitutional error either by presenting extrinsic evidence in a collateral proceeding or by contending that the trial court transcript, considered as a whole, demonstrates that the error was harmless. As the Court emphasized in *Chapman*, "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error." 386 U.S. at 23, 87 S.Ct. at 827–28. In his concurring opinion in *Chapman*, Justice Stewart elaborated on this idea by cataloguing the "long line of cases, involving a variety of constitutional claims in both state and federal prosecutions, [in which] this Court has steadfastly rejected any notion that constitutional violations might be disregarded on the ground that they were 'harmless.'" *Id.* at 42, 87 S.Ct. at 837. This list included cases in which the Court reversed convictions after involuntary confessions had been introduced at trial, *e.g.*, *Lynumn v. Illinois*, 372 U.S. 528, 537, 83 S.Ct. 917, 922, 9 L.Ed.2d 922 (1963); cases in which a defendant was denied counsel at trial, *e.g.*, *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); cases in which the judge had a financial interest in the result, *e.g.*, *Tumey v. Ohio*, 273 U.S. 510, 535, 47 S.Ct. 437, 445, 71 L.Ed. 749 (1927); cases in which the defendant was tried in a community exposed to highly adverse publicity about his case, *e.g.*, *Sheppard v. Maxwell*, 384 U.S. 333, 351–52, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966); cases in which the jury instruction contained an unconstitutional presumption, *e.g.*, *Bollenbach v. United States*, 326 U.S. 607, 613–15, 66 S.Ct. 402, 405–06, 90 L.Ed. 350 (1946); cases in which the conviction rested on a constitutionally impermissible ground, *e.g.*,

*Stromberg v. California*, 283 U.S. 359, 367–68, 51 S.Ct. 532, 535, 75 L.Ed. 1117 (1931); and, finally, cases involving discrimination in the jury selection process, *e.g.*, *Whitus v. Georgia*, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967). As Justice Stewart emphasized, none of the reversals in these cases "turn[ed] on any showing of prejudice to the defendant." *Chapman*, 386 U.S. at 44, 87 S.Ct. at 838. Although Justice Stewart's list dates back nearly twenty years, his observation still applies today to a substantial body of caselaw.

As the Supreme Court just last term clarified in *Perry v. Leeke*, 488 U.S. 272, 278, 109 S.Ct. 594, 599, 102 L.Ed.2d 624 (1989), "a showing of prejudice is not an essential component of a violation of the rule announced in *Geders*." In *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), a federal district court issued an order in a criminal trial preventing a defendant from consulting with counsel during a seventeen-hour overnight recess occurring between direct and cross-examination of the defendant. The Court held that the order impinged on the defendant's right to counsel. As the Court in *Perry* observed, the *Geders* Court "simply reversed the defendant's convictions without pausing to consider the extent of the actual prejudice, if any, that resulted from the defendant's denial of access to his lawyer during the overnight recess." 488 U.S. at 279, 109 S.Ct. at 599. A plurality of our court, sitting en banc, had already adopted a per se rule of prejudice under *Geders* in a case involving a collateral attack on a state conviction. *See Crutchfield v. Wainwright*, 803 F.2d 1103 (11th Cir.1986) (en banc). As Judge Hatchett, writing for the plurality, stated in *Crutchfield*: "any deprivation of assistance of counsel constitutes reversible error." *Id.* at 1108.[13]

*Gideon*, of course, stands as a classic example of constitutional error requiring a per se rule of prejudice. In *Gideon*, a Florida state court denied an indigent de-

---

**13.** Judge Hatchett explained that, in using the term "deprivation," he meant "a claim of *denial* of counsel," as opposed to "a claim of *ineffective* assistance of counsel," which would require a showing of prejudice pursuant to the standard in *Strickland*. *See Crutchfield*, 803 F.2d at 1108.

fendant's request for appointed counsel. The defendant proceeded pro se and was convicted. The Supreme Court held that the sixth amendment right to assistance of counsel is "fundamental and essential to a fair trial" and thus applies to the states through incorporation into the fourteenth amendment; without considering the issue of prejudice, the Court reversed the conviction. *See* 372 U.S. at 342, 345, 83 S.Ct. at 795, 797.

The rule in *Gideon* also applies to all critical stages. The Court thus reversed a conviction in *Hamilton v. Alabama,* where a defendant pled guilty at his arraignment without counsel. As the Court stated, "[w]hen one pleads to a capital charge without benefit of counsel, we do not stop to determine whether prejudice resulted." 368 U.S. 52, 55, 82 S.Ct. 157, 159, 7 L.Ed.2d 114 (1961).

Drawing upon the principles recognized in *Gideon,* the Court in *Cronic* articulated the rule that, "[i]f no actual 'Assistance' 'for' the accused's 'defence' is provided, then the constitutional guarantee has been violated." 466 U.S. at 654, 104 S.Ct. at 2044. In those circumstances, the Court explained, "although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.* at 659–60, 104 S.Ct. at 2047.

The Court has also applied a conclusive presumption of prejudice in the *Glasser–Holloway* line of cases, which I discuss above. The Court has held that, if a court fails to intervene when an attorney representing multiple defendants informs the court of a conflict of interest, that constitutes reversible error "even in the absence of a showing of specific prejudice." *Holloway,* 435 U.S. at 487–89, 98 S.Ct. at 1180–81. The Court further emphasized in *Holloway* that, when an attorney has a conflict of interest, the "mere physical presence of [that] attorney does not fulfill the Sixth Amendment guarantee." *Id.* at 490, 98 S.Ct. at 1181. As the Court explained,

"[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing." *Id.* at 489, 98 S.Ct. at 1181.

Similarly, in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), the Court held that a trial court's protective order limiting a defendant's cross-examination of a key eyewitness violated the defendant's right to confront his accusers. In the Court's view, because cross-examination is an essential component of the truth-seeking process, and thus vital to due process, the error required reversal without "speculat[ion] as to whether the jury, as sole judge of the credibility of a witness, would have accepted this line of reasoning [designed to impeach the witness on cross-examination] had counsel been permitted to fully present it." *Id.* at 317, 94 S.Ct. at 1111.

A common rationale supports the Court's adoption of a per se rule of prejudice in all of these cases. In each case, the Court begins with the well-established premise that the right to counsel is a fundamental component of the criminal justice system. A defendant needs a lawyer in order to ensure that his rights are protected at every critical stage of his case. But the lawyer has an even larger importance as a component of the criminal justice system. That is, the very integrity of our system— its fairness, its accuracy as a truth-seeking process, and thus its ability to accord justice—depends upon effective assistance of counsel. As the Court stressed in *Cronic,* " [t]he very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free.' " 466 U.S. at 655, 104 S.Ct. at 2045 (quoting *Herring v. New York,* 422 U.S. 853, 862, 95 S.Ct. 2550, 2555, 45 L.Ed.2d 593 (1975)). In the absence of meaningful representation, therefore, " 'a serious risk of injustice infects the trial itself.' " *Id.* at 656, 104 S.Ct. at 2045 (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980)). Such an absence undermines not only the defendant's individual rights, but also the accuracy of

the truth-seeking process and thus the integrity of the criminal justice system itself.

The per se rule of prejudice in cases implicating the right to assistance of counsel follows directly from this premise. The importance of the right to assistance of counsel—in and of itself—requires a conclusive presumption of prejudice when that right is not protected. As the Court reiterated in *Holloway*, "[t]o determine the precise degree of prejudice sustained by [the defendant] . . . is at once difficult and unnecessary. The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 435 U.S. at 488, 98 S.Ct. at 1181 (quoting *Glasser*, 315 U.S. at 75–76, 62 S.Ct. at 467). "The assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'" *Id.* at 489, 98 S.Ct. at 1181 (quoting *Chapman v. California*, 386 U.S. at 23, 87 S.Ct. at 827); *see also Satterwhite v. Texas*, 486 U.S. 249, 255, 108 S.Ct. 1792, 1797, 100 L.Ed.2d 284 (1988).

An obvious rationale supports this per se rule: given the actual or constructive denial of counsel at a critical stage, it is practically impossible to conduct a prejudice inquiry in a collateral proceeding. The prosection would have to prove a lack of prejudice either by presenting extrinsic evidence or by demonstrating, based on the trial court transcript itself, that the denial of representation was harmless. The prosecution could do neither.

As I discuss above with respect to a *Sandstrom* situation, the prosecution would be unable to present any reliable extrinsic evidence in a post-conviction evidentiary hearing in order to rebut the presumption of prejudice raised by the defendant's prima facie case. Assume, for example, that the state, in a case like *Gideon* where the defendant was actually denied counsel, attempted to prove at a collateral evidentiary hearing that the petitioner was not in fact prejudiced by the denial of counsel. Obviously, the state would need the testimony of a lawyer in order to prove the absence of prejudice. The lawyer would have to testify that, even if he had been fully prepared to defend the petitioner at trial, he would not have done anything more than the petitioner actually did himself. Even with that testimony, the state would still have to satisfy the collateral court—by pure argument, I suppose, because the lawyer's testimony would not be probative—that the jury at trial (and not a hypothetical "reasonable" jury) would nevertheless have convicted the petitioner. In other words, from the cold record of the trial, the collateral court would have to be able to say, with great confidence, that the mere presence of an attorney at the trial could not have influenced even one juror to vote not guilty. Of course, before the collateral court decided this question, the petitioner could put his own expert lawyer on the stand. That lawyer would presumably testify that he would have conducted a defense that was radically different from the defense actually conducted by the petitioner. That testimony would reduce even more the reviewing court's ability confidently to decide that the outcome of the trial would have been the same even if the petitioner had an attorney. Clearly, such a procedure would be inherently unreliable.

Nor could the prosecution demonstrate, based on the trial court transcript itself, that the denial of legal representation was harmless. In conducting a harmless-error analysis of trial judge error, as I show above, the court must isolate the error at issue and evaluate its effect on the proceeding as a whole. Unless the court, based on this analysis, can "declare a belief that [the error] was harmless beyond a reasonable doubt," *Chapman*, 386 U.S. at 24, 87 S.Ct. at 828, then it must grant the petitioner relief. In the *Gideon*-type case, the reviewing court simply cannot declare, with any degree of certainty, that the outcome of the trial would have been the same even if the defendant had a lawyer.

The court's ability to conduct a harmless-error review depends upon certain conditions. As the Court explained in *Holloway*, "[i]n the normal case where a harmless-error rule is applied, the error occurs at trial and its scope is readily identifiable. Ac-

cordingly, the reviewing court can undertake with some confidence its relatively narrow task of assessing the likelihood that the error materially affected the deliberations of the jury." 435 U.S. at 490, 98 S.Ct. at 1182. The reviewing court must be able to identify, based on the record of the trial court proceeding, the scope of the error. In addition, the reviewing court must be able to reconstruct, again based on the record, how the proceeding would have occurred without the error. To the extent that the reviewing court finds that the absence of the error would have materially altered the case, the court's reconstruction necessarily becomes fuzzy as well. The record before the reviewing court no longer approximates what would have occurred, and the court can only predict what turns the proceeding might have taken. If the court's analysis reaches that point—the point where reconstruction turns into prediction—then the error at issue cannot be considered harmless.

The per se rule of prejudice in cases where the defendant is actually or constructively denied assistance of counsel reflects the limits of harmless-error review. In the *Gideon*-type case, the denial of counsel "pervade[s] the entire proceeding." *Satterwhite v. Texas*, 486 U.S. at 256, 108 S.Ct. at 1797. If, as I demonstrate above, the reviewing court would be unable to conduct a prejudice inquiry even with the benefit of a lawyer's expert testimony in a post-conviction evidentiary hearing, then it would undeniably be unable to conduct such an inquiry based only on the cold record of the trial proceeding without any extrinsic evidence. That record alone would provide the reviewing court no framework in which to reconstruct the trial: the court could not isolate a given error and determine how the proceeding would have gone without the error. As Justice O'Connor explained in *Satterwhite*, "[s]ince the scope of a violation such as a deprivation of the right to conflict-free representation cannot be discerned from the record, any inquiry into its effect on the outcome of the case would be purely speculative." *Id.* at 256, 108 S.Ct. at 1797; *see Holloway*, 435 U.S. at 490–91, 98 S.Ct. at 1182. The

denial of an attorney "by [its] very nature cast[s] so much doubt on the fairness of the trial process that, as a matter of law, [it] can never be considered harmless." *Id.* 486 U.S. at 256, 108 S.Ct. at 1797. To conduct a harmless-error review in such circumstances would force the reviewing court well beyond the narrow limits envisioned by the *Chapman* Court: the reviewing court's conclusion could be nothing more than "purely speculative," *Satterwhite*, 486 U.S. at 256, 108 S.Ct. at 1797.

In the long run, moreover, a per se rule of prejudice in these kinds of cases may be the most efficient mechanism for preventing miscarriages of justice. Relitigating an entire case in a collateral proceeding, and then sending the case back to the trial judge for further proceedings if necessary, is clearly not an efficient procedure. In addition, a per se rule of prejudice requiring the collateral court to set aside the petitioner's conviction creates a strong incentive for the courts at the state and federal trial level to ensure that a defendant is accorded meaningful representation. A per se rule of prejudice will thus sharpen the trial court's sense of responsibility in discharging its duties at the first stage. In the end, such a result is far more desirable than the "spin-off of collateral proceedings that seek to probe murky memories." *Boykin*, 395 U.S. at 244, 89 S.Ct. at 1713.

With this analytical framework in mind, I now turn to a consideration of the present case.

### III.

Following this framework, the question in the present case becomes whether the circumstances of Stano's plea hearing triggered a duty on the court's part not to accept Stano's guilty pleas *at that time.* Assuming that the court did have such a duty, the question then arises whether the court's failure to discharge that duty constituted reversible error: that is, does a per se rule of prejudice apply to this kind of violation or, if not, was the error harmless. I address these questions in turn.

## A. *The Court's Duty to Intervene.*

This court today emphasizes that a defendant has a right to plead guilty, and that in exercising this right, the defendant can reject his attorney's advice to the contrary and tender his plea. In the court's view, that is all this case involves: Stano rejected his lawyer's advice not to plead guilty at the time and tendered his pleas. Given those facts, says this court, the trial judge correctly allowed Stano to plead, and any holding to the contrary would mean that, in any case where the court allowed the defendant to plead guilty against his attorney's advice, the court would be depriving him of his right to due process. Given those facts, I would agree wholeheartedly with the court's conclusion. Those facts, however, are not the facts of this case.

My disagreement with the court centers on the idea of "advice," and, more specifically, on the kind of advice that an attorney must give in order to provide "the aid of counsel in any real sense," *Powell,* 287 U.S. at 57, 53 S.Ct. at 60. The court finds that Stano's attorney, Mr. Pearl, "advised" Stano not to plead guilty at the time but to wait until Pearl could conduct a more thorough investigation of the case. The court also finds that Stano listened to this "advice," decided not to follow it, and pled guilty. In my view, Mr. Pearl's suggestion that Stano not plead at the time did not constitute "advice"; it did not even approximate the requirements for assistance of counsel in the context of a plea hearing. I demonstrate this point by surveying the established law concerning the minimum standards for assistance of counsel in the plea context. Based on this law, I cannot understand how the court can maintain that Pearl satisfied even the most basic requirements for assistance of counsel.

From the conclusion that Pearl failed to provide assistance of counsel in any real sense, the rest of my analysis logically follows. Under an extensive body of case-law, which I discuss above, the court has a "protecting duty" to ensure that, at every critical stage of the criminal prosecution, a defendant either receives or waives assist-ance of counsel. If the defendant lacks assistance of counsel at a critical stage, and the court has notice of this lack, then the court must either (1) determine that the defendant clearly wants to proceed pro se and knowingly and intelligently waives his right to counsel, or (2) if the defendant does not waive his right to counsel, the court must postpone the proceeding until the defendant has counsel. If the court fails to determine that the defendant waives his right to counsel and nevertheless allows the proceeding to continue, then the court fails to discharge its protecting duty, the defendant is denied his right to assistance of counsel, and the conviction must be reversed. In such a circumstance, moreover, a per se rule of prejudice applies.

In the present case, as I show, Stano lacked genuine assistance of counsel. As I also show, the court had notice that this was the case. The court thus had a "protecting duty" either to determine that Stano wanted to proceed pro se and knowingly and intelligently waived his right to counsel or to postpone the proceeding until Stano had assistance of counsel. Under *Faretta* and its progeny in this circuit, which establish the requirements for a valid waiver of the right to assistance of counsel, Stano clearly did not waive his right to counsel. The court nevertheless accepted Stano's pleas. In my view, the conclusion is inescapable that the court failed to discharge its protecting duty and Stano was denied his right to counsel. Accordingly, prejudice must be presumed and Stano's convictions must be set aside. I develop these points in turn.

I first demonstrate that Pearl failed to provide meaningful assistance of counsel. I do so by analyzing Pearl's conduct in light of the legal standards for assistance of counsel in the plea context.

At the commencement of the plea hearing, Mr. Pearl represented to the court as follows: "I have not yet received full discovery from the state ... and, therefore, am not prepared to say that I know all of the substantive facts concerning these two killings." He explained the reason behind

the State's delay in forwarding the discovery and then declared: "I am not fully prepared to advise him as to whether the State has sufficient evidence to convict him or not." Pearl indicated that he had spoken with the prosecutor, and the prosecutor had assured him "that the State can independently establish the corpus delicti in both of these cases." Pearl also indicated that "Mr. Stano tells me that that is so," i.e., that the State can independently establish the corpus delicti. In addition, Pearl stated that Stano thought his confessions "were made voluntarily, they were made competently, and intelligently after warning of his rights and that, therefore, there does not exist a good possibility that either of his admissions could be suppressed on a hearing." That is, Stano thought his confessions were legally valid. Finally, Pearl informed the court that Stano "wants to go forward and enter this plea" but that "I am not fully prepared at this time as his attorney to advise him with respect to the advisability of a trial or not."

Pearl also testified at the post-conviction evidentiary hearing before the district court. According to his testimony, he had actually received discovery from the State but not discovery relating to collateral crimes evidence that the State was thinking of presenting at trial. He had not, however, thoroughly reviewed that discovery or conducted any independent investigation into the facts. As he explained, after receiving the discovery, he went to talk with Stano. Stano said that he wanted to plead guilty: Stano felt that the State's cases were good and that his confessions were made voluntarily. Pearl testified that "I told him it would be premature, I had no opportunity to make a full investigation, or

take depositions, or to verify any of the allegations of the two indictments...." [14] Following the meeting, Pearl conducted no additional investigation. Pearl also testified that the plea hearing transcript was accurate.

This testimony is entirely consistent with Pearl's representations to the court at the plea hearing. The testimony clarifies that Pearl had in fact received some discovery but that he had undertaken no investigation whatsoever into the facts of the cases, the strength of the State's cases against Stano, or the legal validity of Stano's confessions. As the testimony and the plea transcript both establish, Pearl acted as nothing more than a conduit to the court for his client. *Stano* thought the State had strong cases against him; *Stano* thought his confessions were valid; *Stano* thought the State could independently establish the corpus delicti of the crimes; and *Stano* thought all of this without the benefit of any investigation into the facts, any research into the law, or any legal analysis of the cases by his attorney, Mr. Pearl. And Pearl, in his statement to the court at the plea hearing, confirmed that this was in fact the situation. Based on Pearl's statement, therefore, the court knew that Stano had reached his decision to plead guilty independently of any factual investigation or legal analysis by Pearl. Of course, the court also knew that Pearl had suggested that Stano not plead under those circumstances and that Stano had rejected that advice.

The court today agrees in the main with this statement of the facts. In its view, however, Pearl's statement to Stano suggesting that Stano not yet plead guilty constituted assistance of counsel,[15] and Sta-

**14.** Florida Rule of Criminal Procedure 3.220(d)(1) provides, in pertinent part: "At any time after the filing of the indictment or information the defendant may take the deposition upon oral examination of any person who may have information relevant to the offense charged."

As I note, the State's cases against Stano rested almost exclusively on Stano's confessions. In my view, Pearl, in order to provide Stano meaningful representation, had to depose the police officers who took Stano's confessions and

anyone else having knowledge of the circumstances under which the confessions were taken. Pearl also had to depose every other witness whose testimony was necessary to establish the corpus delicti of the case.

**15.** The majority also suggests that Pearl rendered effective assistance of counsel by "fully appris[ing Stano] of the charges against him" and by informing Stano that he might be sentenced to death. *Ante* at 1142. This is tantamount to an attorney, on the eve of trial, informing his client that he has done no work to

no was entitled to decide to plead despite Pearl's statement. In my view, which I elaborate below, Pearl's statement did not constitute assistance of counsel in any real sense. Once it is established that Stano lacked assistance of counsel in reaching his decision to plead, it follows that the court could accept Stano's pleas only if it first determined that Stano unequivocally wanted to proceed pro se and knowingly and intelligently waived his right to counsel. A defendant, of course, has a right to plead guilty, but if he wants to do so without assistance of counsel, a court cannot accept his plea unless the defendant first waives his right to counsel. The question here thus becomes whether Stano's decision to plead guilty constituted a knowing and intelligent waiver of his right to counsel. Before considering that question—the answer to which is already painfully obvious—I tackle the issue whether Pearl's conduct constituted assistance of counsel.

Courts have explicitly considered what assistance of counsel requires in the context of a plea hearing. In *Von Moltke v. Gillies*, 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948), the Supreme Court stated: "Prior to trial an accused is entitled to rely upon his counsel to make an independent examination of the facts, circumstances, pleadings and laws involved and then to offer his informed opinion as to what plea should be entered." As the Court explained, "[d]etermining whether an accused is guilty or innocent of the charges in a complex legal indictment is seldom a simple and easy task for a layman, even though acutely intelligent." *Id.*, 68 S.Ct. at 322. The Court further explained in *McCarthy v. United States*, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969), that "because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts." As our predecessor court stated, "[p]roviding this 'understanding of the law in relation to the facts' is the function of the accused's appointed counsel." *Walker*

*v. Caldwell*, 476 F.2d 213, 218 (5th Cir. 1973); *see Wofford v. Wainwright*, 748 F.2d 1505, 1508 (11th Cir.1984); *Harris v. Oliver*, 645 F.2d 327, 329 (5th Cir. Unit B May 1981), *cert. denied*, 454 U.S. 1109, 102 S.Ct. 687, 70 L.Ed.2d 650 (1981). Although counsel's duty to one who pleads guilty may be "lesser" than the duty to a client who decides to go to trial, the attorney still must "provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between accepting the prosecution's offer and going to trial." *Wofford*, 748 F.2d at 1508.

These standards focus on three elements: (1) the law, (2) the facts, and (3) the relation between them. Assistance of counsel thus requires that the lawyer have a grasp of the law and the facts so that he can provide the defendant with an understanding of how the law applies to the facts of the case at hand. That is, based on his research of the law and the facts, along with his analysis of the relation between them, the lawyer gives the defendant an "informed opinion" about what plea the defendant should enter. On the basis of that informed opinion, the defendant then decides how to plead. Obviously, if the lawyer does not have a grasp of either the law or the facts, he will be unable to give the defendant an informed opinion. In such a case, therefore, the lawyer will be unable to accomplish his "function." He will not be providing assistance of counsel, and the defendant—without an understanding of the law in relation to the facts—will by definition be unable to make a decision informed by his lawyer's advice.

Applying these standards here, I conclude that Mr. Pearl's conduct clearly fell short of the most basic requirements for meaningful representation. As Pearl stated to the court, he told Stano that he had not evaluated the cases. For exactly that reason—that is, because he had undertaken no independent investigation or analysis—

prepare his client's defense and that it is likely that the defendant will be convicted and sentenced for twenty years. Clearly, as shown below, this is not *effective* assistance of counsel.

Pearl urged Stano not to plead.[16] The applicable legal standards define "advice" as providing the client with an understanding of the law in relation to the facts of his case. Pearl's statement urging Stano not to plead does not constitute such advice.

Nor does Pearl's conduct at the plea hearing itself alter this conclusion. As Pearl himself informed the court, he acted as nothing more than a mouthpiece for Stano, a conduit for Stano's "legal" conclusions regarding the cases. Pearl told the court that Stano thought his confessions were "legally" valid and that Stano thought the prosecutor could independently establish the corpus delicti in both cases. Pearl, of course, also told the court that the

State had told him that the State could independently establish the corpus delicti.[17] Nothing in the transcript of the plea hearing suggests that Pearl did anything more than he indicated he could do: he served merely as a mouthpiece for Stano. Serving as a mouthpiece, however, does not constitute representation.

Pearl thus failed to provide any real assistance of counsel.[18] The nature of Pearl's failure to provide representation also distinguishes this case from the normal ineffective-assistance-of-counsel case, which courts analyze under *Strickland*.[19] First, as Pearl himself admitted, he undertook no factual investigation or legal analysis whatsoever: his lack of assistance was

16. Of course, this urging was assistance, but only in part. Pearl, knowing that he could provide Stano no representation at the plea hearing and that he was thus providing Stano no real assistance of counsel, should have told the court—pursuant to his fundamental duty as an officer of the court—not to accept Stano's pleas unless the court (1) informed Stano that he was in fact proceeding pro se; or (2) asked Stano whether he wanted to waive his right to counsel and proceed pro se; and (3) if Stano said yes, ensured on the record that Stano made a valid waiver; or (4) if Stano said no, postponed the hearing.

17. As I discuss *infra* note 20, the prosecution failed to present any evidence at the plea hearing that corroborated Stano's confessions.

18. The majority characterizes this case as one in which the defendant has preempted his attorney's strategy. This is not that case. Here Pearl had no strategy to preempt, as he candidly admitted, because he had made no independent analysis of the key issues in the cases. Relying on this mischaracterization, the majority cites *Mitchell v. Kemp*, 762 F.2d 886 (11th Cir.1985), for the proposition that a defendant cannot claim ineffective assistance of counsel after he preempts his counsel's strategy. The *Mitchell* court stated, however, that

> [w]hen a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made. Nonetheless, "[i]nformed evaluation of potential defenses to criminal charges and meaningful discussion with one's client of the realities of his case are cornerstones of effective assistance of counsel."

*Id.* at 889 (citations omitted).

In *Mitchell,* the court held that an attorney who had conducted "an independent evaluation of the usefulness of character witnesses" with

the defendant and his father was not acting ineffectively when he did not investigate the case further. The court held that " 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.' " *Id.* (quoting *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066).

In this case, Pearl's failure independently to investigate the admissability of Stano's confessions and the strength of the State's evidence was not a reasonably supported limitation on investigation; indeed, Pearl admitted that he was unprepared to aid Stano at the plea hearing. Thus, *Mitchell* is of no help to the majority; instead, *Mitchell* clarifies Pearl's investigative duty and highlights his failure to discharge this duty.

The other cases the majority cites in support of its contention—that a defendant who preempts his attorney's strategy cannot later claim ineffective assistance—also relied upon the attorney's independent investigation of key operative facts as a basis for denying the defendant's claim. *See, e.g., Foster v. Strickland,* 707 F.2d 1339, 1343–44 (11th Cir.1983) ("[The attorney] did not fail to discover information that was necessary for the competent defense of [the defendant]."); *Tafero v. Wainwright,* 796 F.2d 1314, 1320 (11th Cir.1986) ("A lawyer ... must first evaluate the potential avenues of investigation and then advise the client of their merit. A strategy of silence may be adopted only after a reasonable investigation for mitigating evidence or a reasonable decision that an investigation would be fruitless." (Citations omitted.)

19. As I discuss above, *see supra* at p. 1159, that kind of case involves an attorney error that is not evident on the face of the trial court transcript, rather than an error that does appear on the transcript's face and thus implicates a protecting duty on the court's part. In attorney

total. In the normal *Strickland* case, the attorney either fails to prepare for the trial court proceeding or he performs inadequately, but he does so in the course of representing the defendant. Although ineffective, that representation is still more than nominal. *See, e.g., Hill v. Lockhart,* 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). Here, Pearl's total failure at such an early, but seminal, stage to undertake any of the preparation required under *Von Moltke* makes this a different kind of case. The lack of assistance entirely pervades the case. As a result, the reviewing court has no context in which to conduct a *Strickland* prejudice analysis. Because Pearl in

effect provided no representation, the court cannot isolate his specific errors or omissions and evaluate their effect on the representation as a whole. The court here has no "representation as a whole" against which to evaluate Pearl's errors.

The second difference between this case and the typical *Strickland* case is that the trial court had notice that Stano lacked assistance of counsel. As I detail above, Pearl expressly communicated that fact to the court. The court, moreover, had no basis for questioning Pearl's credibility or the truth of his representations.[20] Consequently, the court had notice that under the circumstances of the case, Stano lacked

error cases, therefore, the defendant has the burden of proof on the prejudice issue.

20. Indeed, the record of the plea hearing supports the truth of Pearl's statement to the court. Pearl told the court that he had not received discovery from the State and had undertaken no independent investigation into the facts. The only information that Pearl had was that *Stano thought* the State could prove its cases. Pearl knew, moreover, that the State's cases rested on Stano's confessions. Again, Pearl had conducted no independent investigation into the confessions. He had not explored whether they could be suppressed; he did not know whether the State had any evidence corroborating the confessions. (Under Florida law, moreover, an uncorroborated "confession alone may not be relied upon to establish the corpus delicti." *Atkins v. Florida,* 452 So.2d 529, 532 (Fla.1984); *see Mitchell v. State,* 45 Fla. 76, 33 So. 1009 (1903)). All Pearl knew was, as he told the court, that *Stano thought* the confessions were good: "[Stano] assures me that those statements were made voluntarily, they were made competently, and intelligently after warning of his rights and that, therefore, there does not exist a good possibility that either of his admissions could be suppressed on a hearing." Stano's opinion, without more, obviously did not satisfy Pearl's duty to undertake an independent investigation of the cases and render informed advice. And Pearl knew this; thus, he made his statement to the court.

The remainder of the plea hearing supported the accuracy of Pearl's statement and also, given Pearl's statement, should have alarmed the court. A careful examination of the plea hearing reveals that the prosecutor presented no evidence whatsoever that corroborated Stano's confessions. With respect to the murder of Mary Kathleen Muldoon, the prosecutor submitted the following evidence:

(1) a complaint affidavit filed by Lt. Donald Goods of the New Smyrna Beach Police Department, which states the factual circumstances of the murder;

(2) a death certificate and medical examiner's report;

(3) a police lab report on the bullet removed from Muldoon's head;

(4) a series of photographs, including photos of the crime scene and autopsy photographs showing the bullet and the head wound caused by the bullet;

(5) a police offense report describing a witness' identification of Muldoon's body at the morgue; and

(6) Stano's confession.

The first five items of evidence presented the physical details of the murder. The evidence showed where the murder was committed, demonstrated how it was done, and established that Muldoon was the victim and was indeed murdered. None of this evidence, however, tied *Stano* to the crime. Only the sixth piece of evidence—Stano's confession—did that. Without the confession, the prosecutor had no evidence linking Stano to the murder. In short, the prosecutor relied on the confession, standing alone without any corroborating evidence, to establish the corpus delicti.

The same is true with respect to the prosecution's case against Stano for the Bickrest murder. The prosecutor presented the following evidence for that charge:

(1) Sgt. Paul Crow's summary affidavit;

(2) a Volusia County Sheriff Department's report, outlining the facts of the murder;

(3) a medical examiner's autopsy report;

(4) a series of photographs, including an autopsy photograph of the victim, pictures of the crime scene, and photographs of vegetation and a shoe; and

(5) Stano's confession.

Again, the first four items of evidence merely established the physical details of the crime. None of the items, however, linked Stano to the murder. The last item was Stano's confession, which provided the sole basis for the corpus delicti in the State's case against Stano for the Bickrest murder as well.

assistance of counsel. The court knew that Stano, if he were to proceed with his guilty pleas, would be proceeding *without assistance of counsel.* The court knew that Stano had not been provided with an understanding of the law in relation to the facts of his cases and that Pearl was nothing more than a mouthpiece for his client. In my view, these circumstances triggered the court's "protecting duty" under *Johnson, Gideon,* and *Cronic.*[21]

As I outline above, in some cases, the circumstances surrounding a proceeding may be so extreme as to trigger a duty on the court's part to intervene *sua sponte.* A primary example of this duty is grounded in the right to assistance of counsel, a fundamental due process right. Under *Johnson* and *Gideon,* the court's protecting duty is triggered if an accused appears at a critical stage without an attorney. This protecting duty, however, extends beyond the situation where an accused lacks an attorney's physical presence. In *Holloway,* the Court reaffirmed the application of this duty when an attorney represents to the court that he has a conflict of interest, and in *Cronic* the Court recognized that the court's protecting duty can be triggered "on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small...." 466 U.S. at 659, 104 S.Ct. at 2047. As an example of such a case, the Court pointed to *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). *See Cronic,* 466 U.S. at 660, 104 S.Ct. at 2047.

In *Powell,* the defendants were charged in Scottsboro, Alabama with a capital offense. At their arraignment, a state trial judge appointed "all the members of the

bar," collectively, to represent the defendants at their arraignment, anticipating that "the members of the bar would continue to help the defendants if no counsel appeared." 287 U.S. at 49, 53 S.Ct. at 57. Six days later, the judge called the case for trial and asked if the parties were ready. The state responded that it was; no one responded for the defendants. A lawyer from Tennessee then addressed the court, indicating that he had come to Scottsboro on behalf of some people who were interested in the case. The judge allowed the Tennessee lawyer, with the assistance of the members of the bar, to help with the defendants' cases, which proceeded directly to trial. The defendants were all found guilty and sentenced to death.

The Supreme Court reversed their convictions, holding that the proceedings denied the defendants the assistance of counsel demanded by the due process clause of the fourteenth amendment. As the Court concluded, "during perhaps the most critical period of the proceedings against these defendants, ... when consultation, thorough-going investigation and preparation were vitally important, the defendants did not have the aid of counsel *in any real sense." Id.* at 57, 53 S.Ct. at 59–60 (emphasis added). The Court stressed that no one "could say what a prompt and thorough-going investigation might disclose as to the facts"; but "[n]o attempt was made to investigate. No opportunity to do so was given." *Id.* at 58, 53 S.Ct. at 60. The Court then ascribed to the trial judge the responsibility for ensuring that the defendants received meaningful representation, i.e., the *process* they were *due.* Having found that the trial judge had such a duty, the Court concluded: "that duty is not discharged by an assignment [of counsel] at

---

**21.** As I note above, the court does not assume this duty in every case where a defendant rejects the advice of his attorney. If that advice is given competently, and it constitutes effective assistance of counsel, then the defendant has been "informed" as due process requires, and his decision to reject his lawyer's advice triggers no responsibility on the court's part. That case involves no waiver of the defendant's right to assistance of counsel. He has received such assistance, and his decision to proceed with a

guilty plea despite his lawyer's advice does not constitute a waiver of that right.

Nor does the court automatically assume this duty in every case where an attorney is ineffective. The circumstances of the case must be such as to give the court notice of the attorney's ineffectiveness in order to trigger the court's responsibility to intervene. If the circumstances of the case provide no indication of the attorney's ineffectiveness, then the court's duty to intervene remains untriggered.

such a time or under such circumstances as to preclude the giving of effective aid in the preparation and trial of the case." *Id.* at 71, 53 S.Ct. at 65.

*Powell* and *Cronic* thus begin with the proposition that a criminal defendant has a due process right to assistance of counsel. From that proposition, the cases reason that, even though a figure resembling a lawyer might appear at a crucial proceeding on the defendant's behalf, the circumstances surrounding the case might prevent the lawyer from providing "the aid of counsel in any real sense." *Powell,* 287 U.S. at 57, 53 S.Ct. at 60. Because counsel is so essential to the defendant's case, as well as to ensure the accuracy of the truth-seeking process, the absence of counsel "in any real sense" causes a "breakdown in the adversarial process." *Cronic,* 466 U.S. at 662, 104 S.Ct. at 2049. That breakdown in the process, according to *Powell* and *Cronic,* triggers a duty on the trial judge's part to protect the defendant's right to assistance of counsel. Inaction on the judge's part under such circumstances violates the court's protecting duty—a duty that the due process clause requires the court to discharge. Under *Powell* and *Cronic,* a judge cannot simply sit back and let a proceeding continue if the circumstances are such that no lawyer, even a fully competent one, could provide effective assistance of counsel.[22] The judge can discharge his duty, as I discuss, either by ensuring that the defendant waives his right to counsel or by postponing the proceeding until the defendant has counsel.

The circumstances of the present case, in my view, triggered the trial judge's duty to intervene. As I discuss, this case is practically indistinguishable from a case where a defendant's lawyer fails to appear altogether. Obviously, Pearl appeared at the proceeding, but that appearance was entirely insignificant from a legal perspective. True, Pearl was present in court with Stano, but Pearl had failed to fulfill the minimal requirements for assistance of counsel, and he so informed the trial court. To bring this case sharply into focus, I suggest that one consider Pearl as a cardboard cut-out figure or a Macy's department store mannequin.

Given Pearl's total failure to provide representation in any real sense, that is, given that Pearl was a mannequin, the Court's conclusions in *Powell* apply here as well: "during perhaps the most critical period of the proceedings against th[is] defendant[,]" i.e., the period during which Stano was deciding whether to plead guilty, "when consultation, thorough-going investigation and preparation were vitally important, the defendant[ ] did not have the aid of counsel in any real sense." *Powell,* 287 U.S. at 57, 53 S.Ct. at 59–60. As in *Powell* and *Holloway,* moreover, the judge had notice of the petitioner's situation. Indeed, the present case is indistinguishable from *Holloway:* just as in that case, the lawyer here explicitly informed the court of his inability to provide assistance of counsel. In my view, the conclusion is inescapable that the circumstances here triggered the trial court's protecting duty.

Once that duty was triggered, as I discuss, the court could discharge its responsibilities in one of two ways: either by determining on the record that the petitioner

**22.** As a practical matter, judges rarely allow proceedings to continue once they have notice that an attorney cannot provide effective assistance of counsel. For this reason, *Cronic* claims, although often raised, hardly ever succeed. Frequently, an attorney informs the court at the commencement of a trial that he is unprepared to proceed and moves for a continuance. The court determines that the attorney's statement is not credible and denies the continuance. Indeed, in the context of a criminal case, the defense attorney has obvious reason to stall, and an experienced trial judge might well be skeptical of last-minute requests to continue a trial. In the majority of cases, moreover, the trial record supports the judge's decision: the lawyer provides competent representation at trial. Of course, if subsequent events at trial support the credibility of the lawyer's initial statement of unpreparedness, the situation may become entirely different. Those events put the judge on notice that the lawyer in fact cannot provide effective assistance, and notice of that fact triggers the judge's obligation to intervene. If the judge fails to intervene, then the attorney's ineffectiveness becomes judge error, and the presumption of prejudice attaches. *See Cronic,* 466 U.S. at 648, 104 S.Ct. at 2039; *Powell,* 287 U.S. at 45, 53 S.Ct. at 55; *Willis,* 838 F.2d at 1521–22.

knowingly and intelligently waived his right to assistance of counsel or, absent such a waiver, by postponing the proceeding until the petitioner had counsel. Obviously, the trial court in this case did not postpone the proceeding. The court listened to Pearl's statement, briefly questioned Stano, and then accepted his guilty pleas. If the court discharged its protecting duty, then, it could only have done so by determining on the record that Stano knowingly and intelligently waived his right to assistance of counsel.

Stano undeniably desired to go forward with his pleas. When a defendant lacks assistance of counsel, however, his mere desire to proceed does not relieve the court of its protecting duty. Rather, the court, in order to fulfill its responsibilities, must determine that the defendant's desire to proceed constitutes a knowing and intelligent waiver of his right to counsel. The court makes this determination pursuant to the requirements of *Faretta*.

As I discussed above, *Faretta* and its progeny impose two requirements on the court in determining whether the defendant knowingly and intelligently waives his right to counsel: the court must ensure (1) that the defendant clearly and unequivocally asserts his right to proceed pro se; and (2) that the defendant understands the risks and disadvantages of self-representation. *See Fitzpatrick*, 800 F.2d at 1064–65 (citing *Faretta*, 422 U.S. at 835, 95 S.Ct. at 2541). In the present case, the court clearly failed to satisfy either of these requirements. Under the first requirement, the defendant "must do no more than state his request, either orally or in writing, unambiguously to the court so that no reasonable person can say that the request was not made." *Dorman v. Wainwright*, 798 F.2d 1358, 1366 (11th Cir.1986), *cert. denied*, 480 U.S. 951, 107 S.Ct. 1616, 94 L.Ed.2d 801 (1987). Stano obviously did not "state his request" in accordance with this standard. He submitted no written request to the court, and his oral statements at the plea hearing never even addressed the issue of self-representation. Following Pearl's statement, the court asked Stano whether he cared "to comment on what Mr. Pearl has just said." Stano responded: "No. I believe everything was quite sufficient that he said." Stano then stated that he was "in agreement with what [Pearl] said." One can hardly contend that these statements constituted a request to proceed pro se under *Dorman*. Even if one could so contend, a reasonable person could understandably say that no request was made. *See Dorman*, 798 F.2d at 1366. The first prong of the *Faretta* inquiry thus remained unsatisfied.

In addition, the court failed to discharge its responsibility under the second prong of the *Faretta* inquiry. Again, under *Dorman*, "[i]n this Circuit, the court must ... conduct a hearing on the waiver of the right to counsel to determine whether the accused understands the risks of proceeding pro se." *Id.* The court held no such hearing in the present case. And, although in some rare circumstances, this court has found a valid waiver under *Faretta* in the absence of such a hearing, *see Fitzpatrick*, 800 F.2d at 1068, the present case does not involve such circumstances.

Under the standards of *Faretta* and its progeny, therefore, the trial court failed to ensure that the petitioner knowingly and intelligently waived his right to counsel. Accordingly, the court failed to discharge its protecting responsibility under *Johnson*, *Gideon*, and *Cronic*. Absent a valid waiver of Stano's right to counsel, the court could not accept his uncounseled pleas.

Under these circumstances, moreover, a per se rule of prejudice applies, thus requiring reversal of Stano's convictions. I now discuss the applicability of this per se rule here.

### B. Prejudice Per Se.

When the court is on notice at a critical stage of a criminal prosecution that the defendant is appearing without assistance of counsel—actually or, as here, constructively—the court must exercise its protecting duty either by determining, under *Faretta*, that the defendant clearly asserts his right to proceed pro se and knowingly and intelligently waives his right to counsel or

by postponing the proceeding until the defendant has assistance of counsel. In the present case, the court did not postpone the proceeding nor did it determine, on the record, that the petitioner knowingly and intelligently waived his right to counsel. Accordingly, the case presents the elements under *Cronic* of a prima facie case for reversal of the petitioner's convictions. The question then becomes whether a per se rule of prejudice applies—as in *Gideon,* for example—or whether the State should have an opportunity to rebut the petitioner's case.

In effect, this question has two parts: first, could the State prove that the petitioner properly waived his right to counsel even though the record fails to disclose the requirements of a valid waiver? And second, assuming the State cannot prove that point, can the State demonstrate that the petitioner was not prejudiced by the absence of assistance of counsel? I consider them in turn.

To reiterate, the court's duty under *Faretta* is two-fold: the court must ensure, first, that the defendant clearly and unequivocally asserts his right to self-representation and, second, that the defendant understands the disadvantages of proceeding pro se. As this court has explained, the court must hold a waiver hearing in order to satisfy this second requirement. *See Dorman,* 798 F.2d at 1366. In some rare circumstances, however, the state has proved that the defendant understood the disadvantages of self-representation even in the absence of a waiver hearing. *See Fitzpatrick,* 800 F.2d at 1068. In order to make such a showing, the state presents new evidence, at a collateral proceeding—concerning, for example, the defendant's "background, experience, and conduct," *id.* at 1065—sufficient to demonstrate that the defendant possessed the necessary understanding.

I think the State would have difficulty making such a showing in the present case, but even if it could, it would be precluded by established caselaw from presenting evidence in a collateral proceeding to rebut the presumption of prejudice arising from the absence in the record of a clear assertion of the right to self-representation. This first element under *Faretta* establishes a prophylactic rule: it creates a formal notice requirement that cannot be satisfied by a showing after the fact. The first requirement, like the second requirement, is designed to ensure that the defendant has the state of mind necessary for a valid waiver of a constitutional right: the second requirement concerns the defendant's understanding of the consequences of his waiver; and the first concerns his intention to proceed pro se. Although the second requirement can, in rare cases, be satisfied without a waiver hearing, by evidence pointing to an independent basis for the defendant's understanding, the first requirement cannot be satisfied in that way. Even if the state could point to evidence suggesting that the defendant intended to proceed pro se—for example, evidence that the defendant had prepared his own case, perhaps even an authenticated note in his preparation materials declaring his intent to represent himself—the defendant could still have changed his mind before he appeared at the critical stage. In contrast, once the defendant has developed an understanding of the disadvantages of self-representation, absent some special circumstances, that understanding does not change. In addition, the first requirement also serves a notice function that has no relation to the defendant's intention. That is, by asserting his right of self-representation, the defendant puts the court on notice of his desire to proceed pro se and triggers the court's responsibility under the second prong of *Faretta.* Even if the state could prove that the defendant in fact intended to proceed pro se despite his failure to invoke that right, the state could not satisfy the concerns behind this notice requirement.

Given the nature of the *Faretta* requirements, and the status of the record in this case, the State could present no evidence to prove that, despite the record's inadequacies, Stano in fact invoked his right to proceed pro se and waived his right to counsel. The record clearly indicates that Stano did not waive his right to counsel, and no evidence could be presented at an

evidentiary hearing to alter that conclusion. I now turn to the issue of prejudice under *Johnson, Gideon,* and *Cronic.*

As I discuss above, a per se rule of prejudice applies under these cases, and also under a variety of other cases that implicate a defendant's right to counsel. The characteristic feature of these cases is that the defendant was denied assistance of counsel "in any real sense," *Powell,* 287 U.S. at 57, 53 S.Ct. at 60. The rationale behind this rule is two-fold: first, the right to counsel is so important—to ensure that the defendant receives the process he is due—that the absence of counsel simply cannot be tolerated; second, conducting a prejudice inquiry in such a case is impractical and inefficient. The prosecution would be unable to present reliable proof in a collateral proceeding to show that, despite the transcript of the plea hearing, Stano was not unduly prejudiced. Nor could the prosecution demonstrate, based on that transcript, that the error was harmless.

In order to rebut the presumption of prejudice by presenting extrinsic evidence at a post-conviction evidentiary hearing, the prosecution would have to call to the witness stand an expert—a lawyer who had, in effect, done everything that Pearl failed to do. Prior to the hearing, the expert would have to investigate the facts of the cases (which would require full discovery of all of the circumstances relating to the confessions on which the State based its cases against Stano, *see supra* note 18), would have to research the applicable law, and would have to analyze the law in relation to the facts as required by *Von Moltke.* The expert would then have to testify that he would have told Stano that the State had a high probability of convicting him for both murders and that Stano should therefore plead guilty and subject

himself to the death penalty at the hands of the trial judge.[23] After the expert finished testifying, the prosecution would still have to show that Stano would have followed that advice. Even if the prosecution's expert, after doing everything that Pearl failed to do, were to conclude that a high probability of conviction existed, which I doubt, how in the world could the prosecution show that Stano would have followed that advice? The prosecution could offer nothing but pure speculation.[24] Based on such speculation alone, the reviewing court would clearly be unable to say that Stano was not prejudiced by the denial of counsel.

Nor could the prosecution demonstrate, based on the record, that the error was harmless. Harmless-error review is tied to the trial court record: the reviewing court isolates a given error and then determines, in effect, whether the recorded proceeding would have come out differently absent that error. If the answer is yes, then the error is not harmless. As I discuss above, when the error concerns the defense attorney's total performance (i.e., his nonperformance), harmless-error analysis becomes practically impossible. The error is pervasive; it cannot be isolated; and its effects cannot be evaluated. If the reviewing court would be unable to conduct a prejudice inquiry even with the benefit of a lawyer's expert testimony in a post-conviction evidentiary hearing, then it undeniably could not conduct such an inquiry based only on the cold record of the plea hearing without any extrinsic evidence. That record alone would provide the reviewing court no framework in which to reconstruct the plea hearing: the court could not isolate a given error and determine whether Stano would still have pled guilty even absent that error. As Justice O'Connor explained in *Satterwhite,* "[s]ince the scope

---

**23.** The lawyer, of course, would also tell Stano that he would be subjecting himself to the death penalty at the hands of a judge who had already indicated he would give Stano the death penalty if he were convicted.

**24.** The prosecution, moreover, could not prove this element under an objective, reasonable man standard. The decision to plead guilty is a personal one that can be assessed only under a

subjective standard. The prosecution would therefore have to call Stano to the witness stand and have him testify that, based on the fully informed lawyer's advice, he would still have pled guilty. Given that Stano has brought this collateral attack for the express purpose of attacking his guilty pleas, it is very unlikely that he would provide such testimony.

of [such] a violation ... cannot be discerned from the record, any inquiry into its effect on the outcome of the case would be purely speculative." *Id.* at 256, 108 S.Ct. at 1797; *see Holloway*, 435 U.S. at 490–91, 98 S.Ct. at 1182. To conduct a harmless-error review in such circumstances would force the reviewing court well beyond the narrow limits envisioned by the *Chapman* Court.

The present case attests to the wisdom behind this rule. The district court in fact held a post-conviction evidentiary hearing to consider Pearl's representation. The court, however, treated Stano's claim as an ineffective assistance claim under *Strickland,* putting the burden on Stano to prove prejudice. As a result, the State did not put an expert on the stand to prove that Stano would still have pled guilty even with the benefit of meaningful representation. At the hearing, Stano merely demonstrated the prejudice that was already apparent on the face of the plea hearing transcript. Stano's habeas attorney presented expert testimony regarding the minimum requirements for assistance of counsel in the plea context, and Pearl testified himself about what he actually did know and did do while representing Stano—testimony that confirmed that his representation clearly failed to approximate the minimum standards for meaningful assistance. The State made no rebuttal. Indeed, it could not have done so without presenting expert testimony as I discuss. Consequently, the entire evidentiary hearing was irrelevant to the issue of prejudice: the prejudice question is whether Stano would have pled differently if he had the benefit of counsel in any real sense, and the evidence and argument at the post-conviction hearing did not help to answer that question. Even if the State had presented extrinsic evidence in the form of an expert's testimony, it would still have to prove that Stano would have pled guilty with the benefit of meaningful assistance. Such a showing would be impossible. The reviewing court, quite simply, could never read Stano's mind. And even if the court could read minds, its mind-reading would not address the fairness concerns underlying the per se rule of prejudice. As the Court declared in *Glasser,* "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial." 315 U.S. at 75–76, 62 S.Ct. at 467.

In my view, the court today is bound by law and practical logic to presume prejudice in this case and set aside Stano's convictions.

IV.

For the foregoing reasons, I respectfully dissent from the court's decision to uphold the petitioner's convictions in this case. In my view, the circumstances of this case triggered the trial court's "protecting duty" under *Johnson, Gideon,* and *Cronic.* This protecting duty requires the court either to refuse to accept an uncounseled guilty plea or to ensure that the defendant wants to proceed pro se and knowingly and intelligently waives his right to counsel. By accepting Stano's guilty pleas without meeting its protecting duty, the trial court erred. That error requires, as a matter of law, that the petitioner's convictions be set aside.

In rejecting this analysis, the court today relies on the basic premise that a defendant can plead guilty *at any time,* even if his lawyer is entirely unprepared. In other words, prepared counsel is not a necessary condition for a guilty plea. As I show, this premise is faulty. The Supreme Court, as well as this court, has explicitly stated that, in the context of a plea hearing, the lawyer must provide the defendant with an understanding of the law in relation to the facts of his case. *See Von Moltke v. Gillies,* 332 U.S. 708, 721, 68 S.Ct. 316, 322, 92 L.Ed. 309 (1948); *McCarthy v. United States,* 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969); *Wofford v. Wainwright,* 748 F.2d 1505, 1508 (11th Cir.1984); *Harris v. Oliver,* 645 F.2d 327, 329 (5th Cir. Unit B May 1981), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 687, 70 L.Ed.2d 650 (1981); *Walker v. Caldwell,* 476 F.2d 213, 218 (5th Cir.1973). Clearly, Stano's attorney failed to fulfill the minimal requirements of these standards, thus leaving Stano to proceed, in

effect, without counsel. I am satisfied that, were it not for the majority's blind adherence to its major premise, the court today would agree.